Filed 12/3/15

# IN THE SUPREME COURT OF CALIFORNIA

MICHELLE QUESADA,             )
                                      )
        Plaintiff and Appellant,      )
                                        )           S216305
        v.                           )
                                        )      Ct.App. 2/3 B239602
HERB THYME FARMS, INC.,     )
                                        )      Los Angeles County
        Defendant and Respondent.   )   Super. Ct. No. BC436557
_____)

To buyers and sellers alike, "labels matter." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 328.) They serve as markers for a host of tangible and intangible qualities consumers may come to associate with a particular source or method of production. (*Id.* at pp. 328–329.) Misrepresentations in labeling undermine this signifying function, preventing consumers from correctly identifying the goods and services that carry the attributes they desire while also hampering honest producers' attempts to differentiate their merchandise from the competition.

Among those labels *Kwikset* cited as making a difference to some consumers, and as potentially actionable under state unfair competition law if misused, was the designation of produce or other food as "organic." (*Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at pp. 332–333.) Here we must decide whether such a state law claim is viable, or whether the federal regulatory regime for certifying organic growers preempts a state claim that a certified grower is intentionally mislabeling conventionally grown produce and selling it as organic.

We hold a state law claim that produce is being intentionally mislabeled as organic is not preempted. When Congress entered the field in 1990, it confined the areas of state law expressly preempted to matters related to certifying production as organic, leaving untouched enforcement against abuse of the label "organic." Moreover, a central purpose behind adopting a clear national definition of organic production was to permit consumers to rely on organic labels and curtail fraud. Accordingly, state lawsuits alleging intentional organic mislabeling promote, rather than hinder, Congress's purposes and objectives. Because the Court of Appeal concluded to the contrary, finding these state fraud claims impliedly preempted, we reverse its judgment.

PROCEDURAL AND FACTUAL BACKGROUND

This case is a putative class action challenging an herb grower's marketing of its herbs as organic. Because this appeal follows the granting of a motion for judgment on the pleadings (Code Civ. Proc., § 438), we accept as true the allegations of the complaint (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166).

Defendant Herb Thyme Farms, Inc. (Herb Thyme), is a large herb-growing operation with multiple farms throughout California. Most of its farms use conventional growing methods, but one of its farms uses organic processes and has been properly certified by a registered certifying agent. When it comes time for distribution and marketing, however, Herb Thyme brings its conventionally grown and organic herbs to the same packing and labeling facility, processes them together, and sends blended conventional and organic herbs out under the same "Fresh Organic" label and packaging. As well, Herb Thyme packages and labels as organic some herbs that are entirely conventionally grown.

Plaintiff Michelle Quesada is a consumer who purchased Herb Thyme herbs at a premium in the belief they were, in fact, 100 percent organic. Her suit, filed as a class and representative action, challenges as false advertising and unfair competition Herb Thyme's practice of selling conventionally grown herbs under an organic label. The

2

operative complaint, the second amended complaint, alleges violations of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), unfair competition law (Bus. & Prof. Code, § 17200 et seq.), and false advertising law (Bus. & Prof. Code, § 17500 et seq.).

Herb Thyme sought judgment on the pleadings on federal preemption and primary jurisdiction grounds. The Organic Foods Production Act of 1990 (7 U.S.C. §§ 6501–6522; Organic Foods Act), Herb Thyme argued, vests the United States Department of Agriculture (USDA) with exclusive authority to regulate the labeling and marketing of organic products and both expressly and impliedly preempts state truth-in-advertising requirements. In the alternative, Herb Thyme asked the trial court to defer action under primary jurisdiction principles unless and until an administrative complaint had been pursued through the USDA. The trial court agreed with both express and implied preemption arguments and entered a defense judgment.

The Court of Appeal affirmed. It disagreed with the trial court's finding of express preemption, reasoning that the express preemption provisions in the Organic Foods Act limited state organic certification programs but did not foreclose state false advertising suits. However, it agreed such suits were a potential obstacle to Congress's purposes and objectives of establishing uniform national standards for organic production and labeling, and thus impliedly preempted.

We granted review to consider these preemption questions.

DISCUSSION

I.     *State and Federal Regulation of Organic Products*

The "first [use of] the word 'organic' to describe a method of farming in which the farmer strove for improved natural soil condition through the use of natural additions of manure and compost and the avoidance of chemical amendments" traces to the 1940s, perhaps not coincidentally the time when use of synthetic pesticides first became widespread. (Watnick, *The Organic Foods Production Act, the Process/Product Distinction, and a Case for More End Product Regulation in the Organic Foods Market*

3

(2014) 32 UCLA J. Envtl. L. & Pol'y 40, 45 & fn. 20 (Watnick); see Pasquinelli, *One False Move: The History of Organic Agriculture and Consequences of Non-Compliance with the Governing Laws and Regulations* (2010) 3 Golden Gate U. Envtl. L.J. 365, 368 & fn. 13.)  Sales of organic products remained a niche industry for another generation, but by the 1970s a broader market for organic food had begun to emerge.  (Amaditz, *The Organic Foods Production Act of 1990 and Its Impending Regulations:  A Big Zero for Organic Food?* (1997) 52 Food & Drug L.J. 537, 538 (Amaditz); Lathrop, *Pre-empting Apples with Oranges: Federal Regulation of Organic Food Labeling* (1991) 16 J. Corp. L. 885, 886 (Lathrop).)

This nascent unregulated market was not without its problems.  For one, the absence of any uniform, agreed-upon standards created consumer confusion:  "Even the most sophisticated organic consumer finds it difficult to know, with certainty, what the term 'organic' really means."  (Sen.Rep. No. 101-357, 2d Sess., p. 289 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.)  For another, the combination of consumers willing to pay a premium for organic products and the absence of definite standards created incentives for sharp practices.  (*Id.* at pp. 289–290, reprinted in 1990 U.S. Code Cong. & Admin. News, at pp. 4943–4944; Amaditz, *supra*, 52 Food & Drug L.J. at p. 539 ["Because no regulations existed, unscrupulous producers could proffer almost any organic claim to render their food more marketable."]; Lathrop, *supra*, 16 J. Corp. L. at pp. 890–891.)

The several states stepped in first.  Oregon enacted a first-of-its-kind state organic certification law in 1973.  (Or. Rev. Stat. former § 632.925; see Watnick, *supra*, 32 UCLA J. Envtl. L. & Pol'y at p. 45 & fn. 24; Lathrop, *supra*, 16 J. Corp. L. at pp. 886, 891.)  California followed in 1979, modeling its statute on Oregon's template.  (Health & Saf. Code, former §§ 26469, 26569.11–26569.17, 26850.5–26850.6, added by Stats. 1979, ch. 914, pp. 3143–3149; see Bones, *State and Federal Organic Food Certification Laws: Coming of Age?* (1992) 68 N.D. L.Rev. 405, 410; Lathrop, at p. 891.)  By 1990, 22

4

states had some form of regulation of organic production. (Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943; Bones, at p. 408 & fns. 11–13; Lathrop, at pp. 891–892 & fn. 53.)

Frustratingly, however, no two state laws were the same. (Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.) This multiplicity of certification procedures and standards presented ongoing difficulties for both consumers and the marketplace. (*Ibid.* ["While State action represents a positive step forward for the organic foods industry, the differing state laws have also [led] to consumer confusion and troubled interstate commerce."].) Seeking uniformity, the organic producer community lobbied for federal regulation. (*Id.* at p. 290, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4944; Franzen, *Will GATT Take a Bite Out of the Organic Food Production Act of 1990?* (1998) 7 Minn. J. Global Trade 399, 401.)

In 1990, Congress responded. The Organic Foods Act (7 U.S.C. § 6501 et seq.) directs the establishment of national baseline standards for the production, labeling, and sale of organic products. Aside from prohibiting the use of synthetic chemicals, the act itself does not define organic production. (*Id.*, § 6504; see Sen.Rep. No. 101-357, 2d Sess., p. 292, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4946 [acknowledging that "[o]rganically produced food defies simple definition"].) It leaves that task to the USDA, which is to issue regulations supplying suitable definitions. (7 U.S.C. §§ 6517–6518, 6521(a).) Complementary state standards are permitted and, with the USDA's approval, may be more stringent than federal standards. (*Id.*, § 6507(b); Sen.Rep. No. 101-357, 2d Sess., pp. 295, 567, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 4949, 5221.) The act also does not establish certification procedures, but again directs the USDA to do so. (7 U.S.C. § 6503.) Producers may label and sell their products as organic only if they have been produced in compliance with an approved organic plan. (*Id.*, §§ 6504, 6505(a), 6506(a)(2), 6513.) Individual plan approval must come from either state officials or private certifying agents. (*Id.*,

5

§§ 6513(a), 6514(a).) Producers who have been certified may label their products as organic and use the official USDA Organic seal.[1]

After some delay, the USDA in 2000 issued its final rule adopting implementing regulations, with the regulations to take effect in 2002. (65 Fed.Reg. 80548 (Dec. 21, 2000).) The final rule establishes detailed production and handling requirements for any product being sold as organic. (7 C.F.R. §§ 205.105, 205.200–205.290, 205.600–205.607 (2015).) The rule regulates organic labeling, including establishing the precise compositional requirements for products labeled " '100 percent organic,' " " 'organic,' " and " 'made with organic . . . ingredients.' " (*Id.*, §§ 205.300–205.309 (2015).)[2] As the Organic Foods Act had contemplated, the final rule also sets out the procedure for states to draft their own organic regulatory programs (including more restrictive requirements) and submit them for USDA approval. (*Id.*, §§ 205.620–205.622 (2015).) Other portions of the final rule spell out the details of producer certification. (*Id.*, §§ 205.400–205.406 (2015).)

Thereafter, California became the first state to have its own organic program approved. (See Food & Agr. Code, §§ 46000–46029; Health & Saf. Code, §§ 110810–110959.) The California Organic Products Act of 2003 incorporates by reference federal regulations under the Organic Products Act. (Food & Agr. Code, § 46002, subd. (a).) Additionally, it grants authority to the Secretary of the Department of Food and

---

[1]    This is the mark:



[2]    For example, products labeled "organic" must contain "not less than 95 percent organically produced raw or processed agricultural products." (7 C.F.R. § 205.301(b) (2015).) Moreover, any nonorganic components are subject to their own restrictions and requirements. (*Ibid.*)

Agriculture to maintain lists of registered certified organic producers and handlers, conduct inspections of organic operations, and adopt additional regulations governing organic production. (Food & Agr. Code, §§ 46002, subd. (b), 46003.5, 46013.1, 46013.2, 46014.4, 46018.1; Health & Saf. Code, § 110950.)

With respect to enforcement, the federal Organic Foods Act imposes civil penalties for labeling or selling products as organic when the act has not been complied with. (7 U.S.C. § 6519(a).) The act contemplates a cooperative state-federal enforcement regime. (Sen.Rep. No. 101-357, 2d Sess., p. 304, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4958 ["The Committee expects that enforcement responsibilities will be shared among the Secretary [of the USDA], the governing State officials, and the certifying agents."].) As noted, states may establish organic certification programs (7 U.S.C. § 6507); once federally approved, these state programs take principal responsibility for certifying growers and instituting administrative proceedings for noncompliance with the governing standards (7 C.F.R. § 205.668(b) (2015)). California's state program authorizes anyone to file a complaint concerning noncompliance (Food & Agr. Code, §§ 46004, 46016.1, subd. (a); Health & Saf. Code, § 110940, subd. (a)) and authorizes both the Secretary of the Department of Food and Agriculture and county agricultural commissioners to conduct investigations and impose civil penalties (Food & Agr. Code, §§ 46000, subd. (b), 46016.1–46017; Health & Saf. Code, §§ 110915, 110930, 110940). County agricultural commissioners may also ask their district attorneys to bring enforcement actions. (Food & Agr. Code, §§ 46006, 46018.2.)

We must decide whether this regulatory framework leaves room for claims under state laws of general application targeting fraud and misrepresentation.

7

II. *Preemption*

A. *General Principles*

"The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935; see U.S. Const., art. VI, cl. 2; *Arizona v. United States* (2012) 567 U.S. ___, ___ [183 L.Ed.2d 351, 368, 132 S.Ct. 2492, 2500].) Similarly, federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements. (See, e.g., *Wyeth v. Levine* (2009) 555 U.S. 555, 576; *Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 713; *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910 , 919, 934–935.) Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law? (*Wyeth*, at p. 565; *Jankey v. Lee* (2012) 55 Cal.4th 1038, 1048.)

We have identified several species of preemption. Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines. (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059; *In re Jose C.* (2009) 45 Cal.4th 534, 550; *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, *supra*, 41 Cal.4th at pp. 935– 936.) Two of these are at issue here: express preemption and obstacle preemption. The burden is on Herb Thyme, the party asserting preemption, to demonstrate either applies. (*Viva!*, at p. 936; *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 956.)

B. *Express Preemption*

Herb Thyme contends the Organic Foods Act expressly preempts suit under general state consumer laws because it comprehensively displaces state remedies and enforcement procedures. We conclude, as the Court of Appeal did, that the act's express preemptive effect is substantially narrower and does not extend to the claims here.

8

We begin with the statutory text, necessarily the source of the best evidence concerning the breadth of Congress's preemptive intent. (*Brown v. Mortensen*, *supra*, 51 Cal.4th at pp. 1059–1060.) "[O]ur task is to ' "identify the domain expressly pre-empted." ' " (*Id.* at p. 1062.)

The Organic Foods Act's provisions explicitly displace state law in two regards. First, they set aside existing state standards for what it means to produce something organically. (7 U.S.C. § 6505(a)(1).)[3] The Organic Foods Act effectively federalizes the term "organic"—an agricultural product is, and may be labeled as, organic if and only if it has been produced in accordance with federally approved standards for what that term is to mean.[4] The many occasionally conflicting state definitions growers and consumers had had to cope with before are no more, largely supplanted by a single federal definition. (See Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943; 65 Fed.Reg. 80548, 80664, 80682 (Dec. 21, 2000).)[5]

Second, the Organic Foods Act federalizes certification, the process by which growers may seek to demonstrate their production methods comply with the uniform federal standard. At the time of enactment, growers faced a patchwork of differing regulations, with dozens of entities offering certification and state requirements varying widely from jurisdiction to jurisdiction. (65 Fed.Reg. 80548, 80664 (Dec. 21, 2000).)

[3]    This provision reads: "On or after October 1, 1993—[¶] (A) a person may sell or label an agricultural product as organically produced *only* if such product is produced and handled in accordance with this chapter; and [¶] (B) no person may affix a label to, or provide other market information concerning, an agricultural product if such label or information implies, directly or indirectly, that such product is produced and handled using organic methods, *except in accordance with this chapter*." (7 U.S.C. § 6505(a)(1), italics added.)

[4]    There are exceptions relating to processed foods and very small growers (see 7 U.S.C. § 6505(c), (d)), but they are not implicated here.

[5]    States may append their own additional requirements, but only after receiving federal approval. (7 U.S.C. §§ 6506(d), 6507(b); 7 C.F.R. § 205.620 (2015).)

Under the Organic Foods Act, the USDA is directed to establish a federal certification program. (7 U.S.C. § 6503(a).) States are permitted to establish their own certification programs (*id.*, § 6503(b)), but these programs must be approved by the USDA before taking effect (*id.*, § 6507(a); 7 C.F.R. § 205.620(e) (2015)). Certification, whether under the USDA's national program or under a federally approved state program, is to be carried out only by certifying agents who themselves have been federally accredited. (7 U.S.C. §§ 6503(d), 6513(a), 6514; 7 C.F.R. §§ 205.500–205.510 (2015).)

These provisions establish federal exclusivity in the affected domains. Whether production processes qualify as organic is to be measured "*only . . .* in accordance with" the provisions of the Organic Foods Act. (7 U.S.C. § 6506(a)(1)(A), italics added.) Use of an organic label requires certification, which may be issued only by federally approved certifying agents and only pursuant to a federal certification program, or federally approved state certification program. The effect of these provisions, as the USDA observed in its final rule implementing regulations under the act, is that "[s]tates and local jurisdictions are preempted . . . from creating programs of accreditation" for certifying agents and, further, "[s]tates also are preempted . . . from creating certification programs to certify organic farms or handling operations" except as approved by the USDA. (65 Fed.Reg. 80548, 80682 (Dec. 21, 2000).)

In contrast, no similar language of exclusivity is included in the provisions of the Organic Foods Act governing sanctions for misuse of the organic label. The act provides for, inter alia, potential civil fines of up to $10,000 and ineligibility for certification for a period of five years. (7 U.S.C. § 6519(c).) But unlike those portions of the Organic Foods Act governing the standards for organic production and certification, nothing in section 6519(c) suggests these federal remedies are intended to displace whatever state law remedies might exist for deception. (See 7 C.F.R. §§ 205.660–205.668 (2015) [discussing enforcement without suggesting displacement of preexisting state remedies for fraud].) The same is true of section 6520 and the regulations adopted pursuant to it

10

(see 7 C.F.R. §§ 205.680–205.681 (2015)), which establish the procedures for growers to challenge state or federal government actions; they too do not address or suggest displacement of state consumer actions. As a matter of express preemption, we have no reason to conclude Congress intended its federal remedies as not only a floor—ensuring that, whatever else state law might provide for, some teeth would back up the new federal regulation of organic labeling—but also a ceiling, with states prohibited from continuing to augment these limited remedies. On the subject of state consumer-deception laws of general application, the text of the Organic Foods Act offers only silence.

Notably, the Organic Foods Act permits states to adopt more stringent standards governing organic production. (7 U.S.C. § 6507(b).) The standards it imposes are minimum, not absolute, standards. If the act operates that way even in areas where it explicitly preempts state law, then it is all the more difficult to infer that in matters of enforcement, where no explicit preemption language is used, Congress clearly intended to demand exclusivity and not simply provide a floor.

Consistent with this view of the text, those courts to consider the reach of the Organic Foods Act have found no express preemption of state consumer protection lawsuits. In *In re Aurora Dairy Corp. Organic Milk Marketing* (8th Cir. 2010) 621 F.3d 781, the Eighth Circuit considered and rejected the argument that the act expressly preempted state mislabeling claims. It recognized the limited nature of express preemption under the act, which extends to state standards and certification programs not approved by the USDA but no further. In contrast, "Congress did *not* expressly preempt state tort claims, consumer protection statutes, or common law claims." (*Id.* at p. 792.) Federal trial courts have arrived at the same conclusion. (See *Jones v. ConAgra Foods, Inc.* (N.D.Cal. 2012) 912 F.Supp.2d 889, 894–895 [claim under California unfair competition and false advertising laws that "organic" food is mislabeled because it contains disqualifying ingredients is not expressly preempted]; *Brown v. Hain Celestial Group, Inc.* (N.D.Cal. 2012) 2012 U.S. Dist. Lexis 108561, p. *26 [same].) In *Brown*,

11

for example, the court rejected an argument for express preemption of any state law claims challenging whether a product was properly labeled "organic," holding instead that only independent state certification laws were preempted. (*Brown*, at pp. *25–*26.) To hold otherwise "would mean that a consumer would have no protection against deceptive or fraudulent labeling based on the use of the term 'organic,' " despite "the absence of clear congressional intent to do this." (*Id.* at p. *26.)

Herb Thyme relies on one additional district court case, *All One God Faith, Inc. v. The Hain Celestial Group, Inc.* (N.D.Cal. 2012) 2012 U.S. Dist. Lexis 111553, 2012-2 Trade Cas. (CCH) ¶ 78,018, to support its argument, but that decision is inapposite. The case involved a federal Lanham Act mislabeling claim, not a state claim, and the court concluded the claim was barred on grounds of primary jurisdiction, not preemption. Moreover, the principal authority the court relied upon, *POM Wonderful LLC v. Coca-Cola Co.* (9th Cir. 2012) 679 F.3d 1170, was subsequently reversed by *POM Wonderful LLC v. Coca-Cola Co.* (2014) 573 U.S. ___ [189 L.Ed.2d 141, 134 S.Ct. 2228].

Noting the Organic Foods Act preempts existing state organic certification programs and requires future certification programs to be submitted for federal approval (7 U.S.C. § 6507; 65 Fed.Reg. 80548, 80682 (Dec. 21, 2000)), Herb Thyme argues the scope of express preemption reaches beyond certification of grower processes and agents to laws of general application that might otherwise provide private causes of action for mislabeling and deception. The only remedies for mislabeling, it maintains, are those in the act, except insofar as a state submits additional remedies to the USDA for approval under section 6507. Herb Thyme analogizes to the federal regulation of workplace safety under the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), which it contends preempts all state regulations affecting the covered subject matter except insofar as they have been submitted to the appropriate federal agency for approval.

However, by its terms, section 6507 requires only the submission of *certification programs*, the state programs pursuant to which state officials and certifying agents will

grant or revoke certification of the processes used by farms and handling operations within a state's borders.  (See 7 U.S.C. §§ 6506(d), 6507; 7 C.F.R. §§ 205.620–205.622 (2015).)  Nor does the analogy to workplace safety regulation provide assistance.  The federal approval requirement under the Occupational Safety and Health Act is facially broader, extending to any "State plan for the development of [occupational safety and health] standards *and their enforcement*."  (29 U.S.C. § 667(b), italics added.)  No corresponding provision of the Organic Foods Act raises any possibility of subjecting enforcement mechanisms to federal approval.  Moreover, even under the Occupational Safety and Health Act, "state laws of general applicability . . . that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike would generally not be pre-empted."  (*Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 107.)  The same holds true under the Organic Foods Act; laws of general applicability regulating deception by every seller of goods and services are not expressly preempted.

Accordingly, like the Court of Appeal and every previous court to consider the question, we conclude the Organic Foods Act does not expressly preempt general state consumer fraud statutes.

### C.     *Obstacle Preemption*

As an alternative to express preemption, Herb Thyme argues the state claims pleaded here interfere with congressional goals and should be barred.  Far from posing an obstacle, we conclude claims such as these affirmatively further the purposes of the act.  Accordingly, they are not impliedly preempted.

Obstacle preemption permits courts to strike state law that stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 67; accord, *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, *supra*, 41 Cal.4th at p. 936.)  It requires proof Congress had particular purposes and objectives in mind, a demonstration that

13

leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was.  Ultimately, "what constitutes a 'sufficient obstacle [for a finding of implied preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.' " (*Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at p. 992, italics omitted, quoting *Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 373.)

Historically, the United States Supreme Court and this court have conducted the search for congressional intent through the lens of a presumption against preemption. (E.g., *Wyeth v. Levine*, *supra*, 555 U.S. at p. 565; *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 449; *Brown v. Mortensen*, *supra*, 51 Cal.4th at pp. 1060, 1064.)  The presumption is founded on "respect for the States as 'independent sovereigns in our federal system' "; that respect requires courts "to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' " (*Wyeth*, at p. 565, fn. 3.)  The strength of the presumption is heightened in areas where the subject matter has been the longstanding subject of state regulation in the first instance; where federal law touches "a field that ' "has been traditionally occupied by the States," ' " the party seeking to show preemption "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " (*De Buono v. NYSA-ILA Medical and Clinical Services Fund* (1997) 520 U.S. 806, 814; see *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 663–664 ["In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption."].)  A rebuttal of the presumption requires a demonstration that preemption was the " ' "clear and manifest purpose of Congress." ' " (*Wyeth*, at p. 565.)

The regulation of food labeling to protect the public is quintessentially a matter of longstanding local concern.  The first state legislation designed to address fraud and

14

adulteration in food sales was enacted in 1785. (Bones, *State and Federal Organic Food Certification Laws: Coming of Age?*, *supra*, 68 N.D. L.Rev. at p. 409.) California began regulating food mislabeling in the 1860s, just a few years after statehood. (See Stats. 1862, ch. 365, § 5, pp. 484–485 ["It is hereby forbidden, and declared a misdemeanor, to sell any article, to be used as food or drink by persons, under a false name, with intent to deceive the purchaser as to the real nature of the article."]); *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1088.) In response to widespread mislabeling, misbranding, and adulteration by food suppliers, by the late 18th century "many if not most states exercised their traditional police powers to regulate generally the marketing of impure or deceptively labeled foods and beverages." (*Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at p. 960; see *id.* at pp. 959–961.)[6]

Given this longstanding state oversight, the federal government has assumed a more peripheral role and routinely left undisturbed local policy judgments about how best to protect consumers. "If there be any subject over which it would seem the States ought to have plenary control, and the power to legislate in respect to which it ought not to be supposed was intended to be surrendered to the general government, it is the protection of the people against fraud and deception in the sale of food products." (*Plumley v. Massachusetts* (1894) 155 U.S. 461, 472.) "[T]he supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern." (*Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 144.) Federal minimum standards for the processing of foodstuffs ordinarily do not foreclose "state control over the distribution and retail sale of those commodities in the interests of the *consumers* of

---

[6]    Outside of food regulation as well, states have long concerned themselves with the protection of consumers against deceptive and unfair business practices. (*California v. ARC America Corp.* (1989) 490 U.S. 93, 101; *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1091.)

15

the commodities within the State." (*Id.* at p. 145.) This includes state regulation "designed to prevent the deception of consumers." (*Id.* at p. 146.)

Consequently, the presumption against preemption "applies with particular force" where state consumer protection laws regulating deceptive food labeling are at issue. (*Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at p. 1088; see *Bronco Wine Co. v. Jolly*, *supra*, 33 Cal.4th at p. 974 [given the states' "extensive and dominant" exercise of police power to regulate food labeling, "a strong presumption against preemption applies"]; *General Motors Corp. v. Abrams* (2d Cir. 1990) 897 F.2d 34, 41–42 ["compelling evidence of an intention to preempt is required" where consumer protection is concerned].) The expectation Congress would have said something expressly if it had intended to override the states' longstanding regulatory primacy is at its apex here. (See *Farm Raised Salmon Cases, supra,* 42 Cal.4th at p. 1091.)

In recent years, the continuing vitality of the nearly 70-year-old presumption against preemption has come into question. Four Supreme Court justices have called for its abandonment. (*CTS Corp. v. Waldburger* (2014) 573 U.S. ___, ___ [189 L.Ed.2d 62, 79–80, 134 S.Ct. 2175, 2189] (conc. opn. of Scalia, J., joined by Roberts, C.J., Thomas & Alito, JJ.); *PLIVA, Inc. v. Mensing* (2011) 564 U.S. ___, ___ [180 L.Ed.2d 580, 594-595, 131 S.Ct. 2567, 2579–2580] (plur. opn. of Thomas, J., joined by Roberts, C.J., Scalia & Alito, JJ.); *Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 98–103 (dis. opn. of Thomas, J., joined by Roberts, C.J., Scalia & Alito, JJ.).) However, this view has yet to command a majority. Nor is it clear those justices arguing for presumptionless preemption analysis would apply that approach to obstacle preemption. *CTS Corp.* and *Altria Group* were express preemption cases, while *PLIVA* was a conflict preemption case. The separate opinions in the two express preemption cases limited their call for a repeal of the presumption to cases interpreting express preemption clauses (*CTS Corp.*, at p. ___ [189 L.Ed.2d at p. 80, 134 S.Ct. at p. 2189]; *Altria Group*, at p. 102), while the conflict preemption case offered a theory of interpretation arguably applicable only to cases

16

where compliance with state and federal law would be impossible (*PLIVA*, at p. ___ [180 L.Ed.2d 580, 594–595, 131 S.Ct. 2567, 2579–2580]). In contrast, both Chief Justice Roberts and Justice Scalia have continued to sign opinions employing the presumption in obstacle preemption cases (see *Hillman v. Maretta* (2013) 569 U.S. ___, ___ [186 L.Ed.2d 43, 51–52, 133 S.Ct. 1943, 1950]), while Justice Alito has complained of the court's "giv[ing] short shrift to our presumption *against* pre-emption" in another obstacle preemption case (*Arizona v. United States*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 401, 132 S.Ct. at p. 2530] (conc. & dis. opn. of Alito, J.)).[7]

For now, *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230, the original source of the presumption, and the countless cases that have followed it remain the law. Justices Kennedy, Ginsburg, Breyer, Sotomayor and Kagan still endorse and apply a presumption. (*CTS Corp. v. Waldburger*, *supra*, 573 U.S. at p. ___ [189 L.Ed.2d at p. 79, 134 S.Ct. at pp. 2188–2189] (plur. opn. of Kennedy, J., joined by Sotomayor & Kagan, JJ.); *PLIVA, Inc. v. Mensing*, *supra*, 564 U.S. at p. ___ [180 L.Ed.2d at pp. 605–607, 131 S.Ct. at pp. 2590–2592] (dis. opn. of Sotomayor, J., joined by Ginsburg, Breyer & Kagan, JJ.); see *Arizona v. Inter Tribal Council of Arizona* (2013) 570 U.S. ___, ___ [186 L.Ed.2d 239, 257–259, 133 S.Ct. 2247, 2260–2261] (conc. opn. of Kennedy, J.) [questioning whether a "presumption" is the best way to characterize the appropriate canon of construction, while espousing the view that "a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power"].)

---

[7] The fourth justice, Justice Thomas, does not recognize obstacle preemption as ever affording a legitimate basis to set aside state law. (See *Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. ___, ___ [191 L.Ed.2d 511, 526, 135 S.Ct. 1591, 1603] (conc. opn. of Thomas, J.); *Hillman v. Maretta, supra,* 569 U.S. ___, ___ [186 L.Ed.2d 43, 58, 133 S.Ct. 1943, 1955] (conc. opn. of Thomas, J.); *Wyeth v. Levine*, *supra*, 555 U.S. at pp. 594–602, 604 (conc. opn. of Thomas, J.); see generally Sharkey, *Against Freewheeling, Extratextual Obstacle Preemption: Is Justice Clarence Thomas the Lone Principled Federalist?* (2010) 5 N.Y.U. J. L. & Liberty 63, 86–93.)

Accordingly, in this obstacle preemption case, we continue to conduct our analysis from the starting point of a presumption that displacement of state regulation in areas of traditional state concern was not intended absent clear and manifest evidence of a contrary congressional intent. With this presumption in mind, we consider the evident purposes and objectives of the Organic Foods Act.

When it adopted the act, Congress identified a series of related problems on both the demand and supply sides that were hampering development of a healthy organic market. On the demand side, the absence of consistent national standards for organic production had led to "consumer confusion" in the face of "a confusing array of private and State labels," with "[e]ven the most sophisticated organic consumer find[ing] it difficult to know, with certainty, what the term 'organic' really means." (Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.) Worse, Congress noted "growing evidence that some conventionally grown food is deliberately mislabeled as 'organic' by dishonest traders looking to cash in on the premium prices organic food commands." (*Id.* at pp. 289–290, reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 4943–4944.) From the supply side, growers had "no choice but to produce and label their products according to conflicting standards." (*Id.* at p. 289, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.) They were sometimes competing with producers subject to lower standards, or with others able to get away with intentional mislabeling, and often found "large food chains and distributors concerned about verifying the authenticity of organic items" and therefore unwilling "to purchase organic products." (*Id.* at p. 290, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4944.)

Against this background, the first section of the Organic Foods Act expressly articulates Congress's intentions. "It is the purpose of this chapter—[¶] (1) to establish national standards governing the marketing of certain agricultural products as organically produced products; [¶] (2) to assure consumers that organically produced products meet a

18

consistent standard; and [¶] (3) to facilitate interstate commerce in fresh and processed food that is organically produced." (7 U.S.C. § 6501.) These three goals interrelate and mutually reinforce each other. A uniform national standard for marketing organic produce serves to boost consumer confidence that an "organic" label guarantees compliance with particular practices, and also deters intentional mislabeling, "so that consumers are sure to get what they pay for." (Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.) In turn, uniform standards "provide a level playing field" for organic growers, allowing them to effectively market their products across state lines by eliminating conflicting regulatory regimes. (*Id.* at p. 290, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4944.) Standards that enhance consumer confidence in meaningful labels and reduce the distribution network's reluctance to carry organic products may increase both supply and demand and thereby promote organic interstate commerce. (*Id.* at pp. 289–290, reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 4943–4944.)

By all appearances, permitting state consumer fraud actions would advance, not impair, these goals. Substitution fraud, intentionally marketing products as organic that have been grown conventionally, undermines the assurances the USDA Organic label is intended to provide. Conversely, the prosecution of such fraud, whether by public prosecutors where resources and state laws permit,[8] or through civil suits by individuals or groups of consumers, can only serve to deter mislabeling and enhance consumer

---

[8] Notably, the state statutes governing enforcement of the Organic Foods Act pursuant to the state's federally approved plan explicitly acknowledge the resource limitations that may constrain effective government enforcement. (Food & Agr. Code, § 46004, subd. (b) [noncompliance complaints shall be handled promptly "to the extent funds are available"]; Health & Saf. Code, § 110940, subd. (b) [same].) The Attorney General highlights this point in her amicus curiae brief, explaining that preemption of state consumer laws "would interfere with [the Organic Food Act's] purposes, leaving enforcement solely to federal and state administrative agencies with substantial resource limitations."

confidence. (See *Bates v. Dow Agrosciences LLC*, *supra*, 544 U.S. at p. 451 ["Private [state] remedies that enforce federal misbranding requirements" can "aid, rather than hinder" the effectiveness of those labeling requirements].) From the grower perspective too, anything that deters the few bad apples, the "dishonest traders looking to cash in on the premium prices organic food commands" (Sen.Rep. No. 101-357, 2d Sess., p. 290, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4944), enhances the overall health of the interstate market and benefits those producers that play by the rules in processing and marketing their products. Private claims like those here are thus consistent with the Organic Foods Act's goals of reassuring consumers and enabling fair competition.

We may consider as well statements by the USDA, which Congress charged with adopting regulations to implement the Organic Foods Act. (7 U.S.C. § 6521.) The agency's views are entitled to considerable weight here, where some aspects of the subject matter are recondite and the USDA, as the entity responsible for preparing regulations under the statutory scheme, has relevant technical expertise. (See *Geier v. American Honda Motor Co.* (2000) 529 U.S. 861, 883; *Jevne v. Superior Court* (2005) 35 Cal.4th 935, 958.)

When the USDA issued its final rule adopting implementing regulations, it emphasized that the uniform federal standards for organic certification were designed to supplement and enhance, rather than foreclose, state law consumer remedies for deception. The final rule commentary recognized "consumer fraud involving organic food does occur," and recited multiple instances where state civil and criminal remedies for such fraud had been pursued. (65 Fed.Reg. 80548, 80668 (Dec. 21, 2000).) However, the legal framework necessary for effective fraud deterrence was often lacking: "[O]nly about half of the States have any organic legislation, and few of those States have laws with enough teeth to permit prosecution of organic fraud. In States without similar laws, the costs associated with remedies via the tort system may be high." (*Id*. at

20

p. 80668.)  Part of the problem was the absence of a clearly defined and accepted meaning for "organic."  (See *id.* at pp. 80663–80664, 80668.)  By "[p]roviding a common set of definitions on organic attributes," the USDA hoped to "reduce the cost associated with enforcement actions in consumer fraud cases" (*id.* at p. 80668), because the new regulations would establish a benchmark against which claims could be measured for deception.  These rules categorically were not intended to prohibit future state fraud actions; to the contrary, the USDA expected the standards "established in this final rule . . . to *fill in important State and regional gaps in enforcement in organic fraud cases.*" (*Ibid.*, italics added; see *id.* at p. 80682 [while the Organic Foods Act may preempt some state laws, it does not federalize the entire area; instead, it "contemplates a significant role for the States and, in fact, envisions a partnership between the States and the Federal Government" in fulfilling the act's purposes].)  In the eyes of the USDA, the Organic Foods Act and its regulations would enable consumers and public prosecutors in every state, not just those few with preexisting laws "with enough teeth" (*id.* at p. 80668), to effectively combat misuse of the organic label on a going-forward basis.

The especially strong presumption against preemption in this precise area reinforces this conclusion.  Congress was surely aware of both the extensive history of state regulation of food labeling and the widespread state regulation of general deception in the marketplace.  (See *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at pp. 1088, 1091.)  Yet it made note of, and expressly set aside, only those state laws establishing either standards for the meaning of "organic" or standards for certification.  (7 U.S.C. §§ 6503, 6505(a)(1), 6506(a)(1)(A), 6507(a); see Sen.Rep. No. 101-357, 2d Sess., p. 289, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4943.)  If it intended to disable state common law and statutory remedies for fraud and deception in this specific area, "its failure even to hint at [such an intent] is spectacularly odd . . . ." (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 491 (plur. opn. of Stevens, J.); see *Segedie v. Hain Celestial Group, Inc.* (S.D.N.Y. 2015) 2015 U.S. Dist. Lexis 60739, pp. *18–*19

21

[rejecting obstacle preemption in part because of clearly defined limits on express preemption under the Organic Foods Act].)

Moreover, because the Organic Foods Act contains no private right of action, implied preemption would render organic labeling uniquely immune from suits for deception because of legislation Congress passed, in part, to *prevent* food from being "deliberately mislabeled as 'organic.' " (Sen.Rep. No. 101-357, 2d Sess., p. 290, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 4944.) Congressional intent is the touchstone of preemption analysis, including implied preemption analysis. To infer from legislation motivated by an explicit concern over the proliferation of fraud in organic sales that Congress intended to eliminate existing fraud remedies would be strange indeed. (See *Medtronic, Inc. v. Lohr*, *supra*, 518 U.S. at p. 487 (plur. opn. of Stevens, J.) [doubting that Congress would have intended to impliedly preempt state remedies against an "industry that, in the judgment of Congress, needed more stringent regulation"]; *POM Wonderful LLC v. Coca-Cola Co.*, *supra*, 573 U.S. at p. ___ [189 L.Ed.2d at p. 153, 134 S.Ct. at p. 2239] ["It is unlikely that Congress intended [a federal statute's] protection of health and safety to result in less policing of misleading food and beverage labels than in competitive markets for other products."].)

The only published appellate decision to consider the scope of implied preemption under the Organic Foods Act, *In re Aurora Dairy Corp. Organic Milk Marketing*, *supra*, 621 F.3d 781 (*Aurora Dairy*), is instructive. In *Aurora Dairy*, the Eighth Circuit held preempted only state consumer protection claims asserting the defendant dairy should not have been permitted to sell milk as USDA Organic because its production methods were not actually consistent with federal regulations—that is, claims making a frontal assault on the validity of the organic producer's government certification. These claims were preempted because they conflicted with the exclusive role of federally certified agents in certifying a producer's methods as organic. (*Id.* at pp. 796–797.) Preempted as well

22

were claims against the federally sanctioned agent alleging that it erred either in initially granting certification or in not thereafter revoking certification. (*Id.* at pp. 787, 795–796.)

But *Aurora Dairy* expressly distinguished as not preempted state law claims that merely challenged the truth of facts relating to certification. (*Aurora Dairy*, *supra*, 621 F.3d at p. 797.) For example, the plaintiffs contested representations that milk was being produced without antibiotics or pesticides and that defendants' cows received humane treatment. (*Id.* at p. 790.) Though evidence of inhumane treatment might have precluded a certifying agent from granting certification, this potential overlap did not require preemption. *Aurora Dairy* rejected the producer's argument that "because the class plaintiffs' claims are based upon allegations that Aurora, despite its certification, knowingly failed to comply with provisions of the [Organic Foods Act] and [implementing regulations] upon which certification is based, those claims must be dismissed, because certification means that Aurora complied with the statute and regulations." (*Id.* at pp. 797–798.) Certification decisions inevitably rested upon only sampled inspections of a producer's operations; allowing proof of dairy misrepresentations, unlike direct challenges to certification, would not require a court to decide whether a certifying agent had erred based on what the agent had seen. (*Id.* at p. 798.) Considering the structure and evident purposes of the Organic Foods Act, the Eighth Circuit concluded suits challenging representations relevant to certification posed no obstacle and need not be preempted. (*Id.* at pp. 798–799.)

Herb Thyme asserts the claims here fall in the category the Eighth Circuit deemed preempted. Herb Thyme notes, correctly, that "split operation[s]"—operations that involve both conventional and organic growing (7 C.F.R. § 205.2 (2015))—are required to establish protections against inadvertent commingling. A grower's plan must include a "description of the management practices and physical barriers established to prevent commingling of organic and nonorganic products on a split operation . . . ." (*Id.*, § 205.201(a)(5); see *id.*, § 205.272(a) ["The handler of an organic handling operation

23

must implement measures necessary to prevent the commingling of organic and nonorganic products and protect organic products from contact with prohibited substances."].)  A claim that the anti-commingling protocols in Herb Thyme's organic plan are inadequate to ensure "true" organic production, notwithstanding the plan's approval by a federal certifying agent, might well be seen as an obstacle to Congress's goal of a consistent national standard; growers arguably should be permitted to rely on agent approval of their plan as confirmation that the production methods in the plan are sufficient.  (See *Aurora Dairy*, *supra*, 621 F.3d at pp. 796–797.)

Given the operative complaint, however, we have no occasion to determine whether such a claim would be preempted, nor whether we agree with the Eighth Circuit concerning the area of implied preemption it identifies.  (Cf. *Segedie v. Hain Celestial Group, Inc.*, *supra*, 2015 U.S. Dist. Lexis 60739, at pp. *12–*19 [disagreeing with *Aurora Diary* and rejecting obstacle preemption even for claims that challenge whether products made by certified production methods are truly organic].)  Unlike the complaint at issue in *Aurora Dairy*, the complaint here accepts as valid Herb Thyme's certification and compliance with federal regulations on its certified organic farm.  Quesada concedes Herb Thyme can and does grow organic herbs, which it is entitled to package and sell using a USDA Organic label.

The gravamen of these claims is different.  Herb Thyme has both certified organic and conventional growing operations.  Underlying each cause of action is the allegation that Herb Thyme not only sells its organic herbs under an organic label, but also knowingly and intentionally sells some conventional herbs under an organic label and at an organic premium price.  Thus, according to the operative complaint, Herb Thyme sometimes intentionally mixes its conventional herbs in with organic herbs.  On other occasions, it fills orders for organic herbs entirely with conventional herbs.  According to the complaint, this fraud is willful: "At all relevant times herein Defendants were aware that Herb Thyme's 'Fresh Organic' herb products were not 100% organic herb products";

24

"Herb Thyme deliberately promoted and continues to promote its conventionally grown fresh herb products to consumers in a false and misleading manner" in order to garner the premium prices organic products command; a USDA Organic label is included on packaging "with the specific intent of deceiving consumers into believing Herb Thyme's conventional herbs are, in fact, organic"; "Stated simply, Defendant[] lied about the nature of its 'Fresh Organic' product line of herbs." The essence of these claims is that Herb Thyme's packaging implicitly represents the herbs within came from its properly certified organic farm, and that representation is, in many cases, intentionally false.

Whether or not the improper certification claims preempted in *Aurora Dairy* would pose an obstacle to congressional purposes and objectives, the claims just recited do not. Congress enacted national standards to boost consumer confidence in the assurances an organic label carries, protect fair competition, and promote the growth of the interstate market for organic goods. (7 U.S.C. § 6501.) It singled out the very practice alleged here, the deliberate mislabeling of conventional produce as organic, as a major reason why national legislation was needed in the first place. (Sen.Rep. No. 101-357, 2d Sess., pp. 289–290, *supra*, reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 4943–4944.) The Organic Foods Act cannot be interpreted, under the guise of obstacle preemption, as shielding from suit the precise misconduct Congress sought to eradicate. To grant immunity against claims of intentional commingling and fraudulent substitution of conventional for organic produce would neither bolster national standards nor enhance consumer confidence, but might instead cause consumers to avoid paying organic premiums "upon realizing preemption grants organic producers a de facto license to violate state fraud, consumer protection, and false advertising laws with relative impunity . . . ." (*Aurora Dairy*, *supra*, 621 F.3d at p. 799; see *Segedie v. Hain Celestial Group, Inc.*, *supra*, 2015 U.S. Dist. Lexis 60739, at pp. *14–*15 [state fraud claims in fact promote a consistent national organic standard].)

25

Herb Thyme further contends permitting this suit to proceed would interfere with the exclusive role granted the USDA, state Department of Agriculture, and certifying agents to ensure compliance with national standards. But while the Organic Foods Act surely gives these entities a leading role in monitoring grower behavior, nothing in the text of the act or its evident purposes suggests Congress intended that role to be exclusive. As discussed in the context of express preemption, the enforcement framework established by the act does not use the language of exclusivity. (*Ante*, pp. 10– 11.) The Court of Appeal noted the omission of a federal private right of action as a basis for inferring exclusivity, but the United States Supreme Court and this court have often explained that such an omission does not demonstrate Congress was opposed to enforcement under state law, and indeed sometimes may support the contrary inference, that preemption of state law claims was not intended. (*Medtronic, Inc. v. Lohr*, *supra*, 518 U.S. at p. 487 (plur. opn. of Stevens, J.) [the omission of a federal private right of action makes *less* plausible the inference that Congress intended the preemption of state remedies]; see *Bates v. Dow Agrosciences LLC*, *supra*, 544 U.S. at p. 448; *Rose v. Bank of America, N.A.* (2013) 57 Cal.4th 390, 395–398; *Farm Raised Salmon Cases*, *supra*, 42 Cal.4th at pp. 1095–1099.)

More generally, the overarching legislative scheme is difficult to reconcile with Herb Thyme's contention that Congress intended only "one expert umpire" to have a say. The regulatory regime the Organic Foods Act establishes is unlike that under, for instance, the Federal Food, Drug, and Cosmetic Act, where a single federal agency centrally regulates the dissemination of pharmaceuticals and tightly controls the exact wording of the disclosures that go with them. (21 U.S.C. § 301 et seq.; see *PLIVA, Inc. v. Mensing*, *supra*, 564 U.S. at p. ___ [180 L.Ed.2d at pp. 588–591, 131 S.Ct. at pp. 2574– 2576].) The Organic Foods Act and its implementing regulations set guidelines, but every certified grower has its own individual production plan, and responsibility for approval of that plan and subsequent enforcement of compliance with it is widely

26

distributed among local and state officials and certifying agents. (7 U.S.C. §§ 6513–6515; see Food & Agr. Code, §§ 46000–46029 [splitting enforcement among the Secretary of the Department of Food and Agriculture and 58 county agricultural commissioners]; Health & Saf. Code, §§ 110810–110959 [same].) In California alone, there are currently more than 30 different active private certifying agents; nationally, there are nearly 80.[9] Given this underlying model, there is little reason to think Congress would have viewed private suits aimed at fraudulent substitutions as a hindrance rather than a help. (*Segedie v. Hain Celestial Group, Inc.*, *supra*, 2015 U.S. Dist. Lexis 60739, at pp. *14–*16; see *Bates v. Dow Agrosciences LLC*, *supra*, 544 U.S. at pp. 451–452 [dismissing the concern that varying outcomes in state suits would be anathema to uniform national labeling requirements and finding no preemption].)

Herb Thyme expresses concern that absent preemption of Quesada's false advertising and unfair competition claims, whether its produce is organic would be evaluated by a lay jury applying a nebulous "reasonable consumer" standard. However, these claims are decided by a judge, not a jury. (*Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 284–285; *People v. Witzerman* (1972) 29 Cal.App.3d 169, 176–177.) Moreover, given the express preemption of state standards for what qualifies as organic, a judge necessarily would decide whether Herb Thyme's produce is organic using the standards of the Organic Foods Act and its implementing regulations, as fully incorporated into state law. (See 7 U.S.C. § 6505(a)(1); Food & Agr. Code, § 46002; Health & Saf. Code, § 110820.)

Alternatively, Herb Thyme contends that the only permitted avenue for consumers to challenge organic mislabeling is through a complaint to the USDA, state Department of Food and Agriculture, or certifying agent, followed by an administrative appeal and,

---

[9] The USDA maintains on its Web site a list of all certifying agents, subdivided by state. (See <http://www.ams.usda.gov/sites/default/files/media/OrganicCertifyingAgents byState.pdf> [as of Dec. 3, 2015].)

27

ultimately, appeal to a United States District Court.  (See 7 U.S.C. § 6520.)  While it is true citizens may lodge complaints with state or federal officials when they suspect grower misconduct (65 Fed.Reg. 80627 (Dec. 21, 2000); Food & Agr. Code, § 46004, subd. (a); Health & Saf. Code, § 110940, subd. (a); 3 Cal. Code Regs., § 1391.3, subd. (a)), the appeal procedures Herb Thyme points to are expressly available only to "[p]ersons subject to the Act" (7 C.F.R. § 205.680 (2015); accord, 3 Cal. Code Regs., § 1391.5, subd. (b))—certified growers and agents—as well as unsuccessful applicants for certification (7 C.F.R. § 205.681(a) (2015); see 3 Cal. Code Regs., § 1391.5, subd. (b)).  Consumers appear to have no standing to pursue those remedies.  Nothing in the language of the act and its regulations forecloses consumers from pursuing other avenues for redress that may actually be open to them.

Finally, Herb Thyme argues private suits like this one interfere with its federally established entitlement to label and sell its herbs as organic and conflict with federal control over who may, and may not, use the USDA Organic label.  However, certification is not a grant of a right to use an organic label on all one's products; neither certified nor uncertified growers are permitted to label as organic that which has not been produced in accordance with an approved organic plan.   (7 U.S.C. § 6505(a)(1)(A); 7 C.F.R. § 205.102 (2015).)  Certification cannot insulate from suit intentional fraud of the sort alleged here; these claims do not contest Herb Thyme's ability to do anything its federal certification actually permits it to do.  Federal authorization to use a particular label need not preempt state consumer protection suits where, as in this area, Congress was surely aware of the prevalence of such state suits and elected not to expressly preempt them, thereby leaving them in place as an effective complementary way of promoting public health and safety.  (See *Wyeth v. Levine*, *supra*, 555 U.S. at pp. 573–575 [rejecting a similar argument for preemption]; *Segedie v. Hain Celestial Group, Inc.*, *supra*, 2015 U.S. Dist. Lexis 60739, at pp. *16–*18 [in reliance on *Wyeth*, rejecting the same argument under the Organic Foods Act].)

28

In sum: the complaint here alleges Herb Thyme has engaged in fraud by intentionally labeling conventionally grown herbs as organic, thereby pocketing the additional premiums organic produce commands. The purposes and objectives underlying the Organic Foods Act do not suggest such suits are an obstacle; to the contrary, a core reason for the act was to create a clear standard for what production methods qualify as organic so that fraud could be more effectively stamped out and consumer confidence and fair market conditions promoted. Nor does anything in the text or background of the act and its regulations indicate Congress intended remedial exclusivity for the enforcement mechanisms it provided. Finding no obstacle to congressional purposes and objectives, we conclude the complaint here is not preempted.

III.    *Primary Jurisdiction*

In the alternative, Herb Thyme asks us to affirm on primary jurisdiction grounds. (See generally *Nader v. Allegheny Airlines* (1976) 426 U.S. 290, 303–304; *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390.) The trial court declined to rule formally on this argument, and the Court of Appeal did not address it. Consequently, although Quesada sought review as to both preemption and primary jurisdiction, we limited the issues when granting review and explicitly confined ourselves to the only matter developed below, federal preemption. We decline to address the applicability or inapplicability of the primary jurisdiction doctrine to this case, leaving it to the lower courts in the first instance in the event Herb Thyme chooses to pursue the argument.

29

DISPOSITION

We reverse the Court of Appeal's judgment and remand for further proceedings not inconsistent with this opinion.

**WERDEGAR, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Quesada v. Herb Thyme Farms, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 222 Cal.App.4th 642
**Rehearing Granted**

_____

**Opinion No.** S216305
**Date Filed:** December 3, 2015
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Carl J. West

_____

**Counsel:**

Kiesel Boucher Larson, Law Office of Raymond P. Boucher, Boucher, Raymond P. Boucher, Maria L. Weitz; Whatley Kallas, Edith M. Kallas, Alan M. Mansfield; Public Justice, Leslie A. Brueckner; Kiesel + Larson, Helen Zukin; Johnson & Johnson and Neville Johnson for Plaintiff and Appellant.

Lexington Law Group, Mark N. Todzo and Howard Hirsch for Center for Food Safety and Organic Consumers Association as Amici Curiae on behalf of Plaintiff and Appellant.

Public Citizen Litigation Group, Adina H. Rosenbaum; Chavez & Gertler and Mark A. Chavez for Public Citizen, Inc., as Amici Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Steven De Salvo, Deputy Attorneys General, for State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Greenberg Traurig, Mark D. Kemple, Karin L. Bohmholdt and Angela L. Diesch for Defendant and Respondent.

U.S. Chamber Litigation Center, Inc., Kate Comerford Todd, Tyler R. Green; Morrison & Foerster, Ruth N. Borenstein and William L. Stern for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Leslie A. Brueckner
Public Justice
555 Twelfth Street, Suite 1230
Oakland, CA  94607
(510) 622-8205

Mark D. Kemple
Greenberg Traurig
1840 Century Park East, Suite 1900
Los Angeles, CA  90067
(310) 586-7700