Filed 12/18/25 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ENVIRONMENTAL DEMOCRACY PROJECT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>RAEL, INC.,<br><br>    Defendant and Respondent. | A170385<br><br>(Alameda County<br>Super. Ct. No. 22CV019973)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The petition for rehearing filed by respondent Rael, Inc. is denied. It is ordered that the opinion filed herein on November 26, 2025, be modified as follows:

1.    On page 37, delete the heading "**A.  Legislative History**" and replace with the heading:

**IV.**

*Legislative History*

2. On page 39, insert the following paragraphs between the end of the carryover paragraph from page 38 and the paragraph beginning "At best, . . .":

Rael also points out that the bill, as originally introduced on February 25, 2002, defined the term "product." It provided: "(l) 'Product' means any product whether organic or a product that is made with organic ingredients. This includes any product which contains any organic ingredients of any percentage quantity. 'Product' means food, animal food, plants used for nonfood purposes including fibers, flowers, ornamental plants, and any nonfood items, made from agriculturally derived products, including cosmetics." (Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as introduced Feb. 25, 2002, § 42 [amending § 110815]; see also *id.*, § 6 [amending § 46004.1, subd. (n) of Food & Agric. Code with similar definition].) In its response to our notice of intent to take judicial notice of various legislative history materials, Rael asserts that the Legislature's nonenactment of this definition supports a narrow construction of COFFA, limited only to "enumerated products such as cosmetics."

We do not agree. It is well established that " ' "[u]npassed bills, as evidences of legislative intent, have little value." ' " (*People v. McCune* (2024) 16 Cal.5th 980, 999; accord, *Oakland Unified School Dist. v. Public Employment Relations Bd.* (2025) 112 Cal.App.5th 725, 756; see also *Hohenshelt v. Superior Court* (2025) 18 Cal.5th 310, 340 [" 'inferences from legislative inaction are necessarily speculative' "].) Here, the fact the Legislature dropped this proposed definition from the final bill could merely reflect uncertainty and/or confusion as to the ultimate scope and meaning of the federal Act to which this legislation was responsive that might seem to make the definition duplicative or otherwise unnecessary (see, e.g., *All One*

2

*God Faith, Inc. v. Hain Celestial Group, Inc.* (N.D. Cal., Sept. 22, 2011, No. C 09-03517 JF (HRL)) 2011 WL 4433817, at *4 [discussing USDA's policy positions in May 2002 and thereafter as to whether personal care products are subject to NOP]). The Legislature might have deemed the definition unnecessary for other reasons. It might reflect the vicissitudes of the legislative process while the Legislature focused primarily on other provisions. Or it might have been lost in the legislative shuffle. We have found no discussion in the legislative history of the reason the Legislature chose not to enact this proposed definition, will not speculate, and accord its nonenactment little weight.

3. On page 43, delete the heading "**B. Public Policy**" and replace with the heading:

## V.

### *Public Policy*

4. On page 46, insert the following new section before "**CONCLUSION**":

## VI.

### *Rehearing*

In a petition for rehearing, Rael asserts that our reliance on portions of legislative history not cited by the parties in their briefs (see footnote 18, *ante,* p. 37) violates Government Code section 68081, which prohibits appellate courts from rendering a decision "based upon an issue which was not proposed or briefed by any party to the proceeding" without affording the parties an opportunity to address the issue in supplemental briefing. (Gov. Code, § 68081.) We disagree.

First, some context. Both parties cited and discussed in their briefs those portions of the legislative history they thought supported their respective positions as to COFFA's intended scope. For a more complete and balanced understanding of the legislative history, we ourselves examined it and concluded there were additional portions that were helpful to our understanding of the statute's history, meaning and purpose (a committee report here and there, as well as the text of several versions of the legislation). In short, all that happened here is that our independent research uncovered some additional legal authority that was relevant to the legal issue before us.

That is a commonplace occurrence when appellate justices decide cases, indeed it is a routine and central feature of appellate review. To require supplemental briefing whenever we ascertain the parties have neglected to cite something pertinent would afford the parties a second bite at the apple to re-brief an issue they have had a full and fair opportunity to address in the merits briefing as best they saw fit. Such a rule also would upend appellate practice. Not only would it significantly delay the efficient administration of our appellate docket, it also would put appellate courts at the mercy of the professional judgments and tactical choices of counsel, their skills and competence, or some combination of both.

Although we have discretion to solicit supplemental briefing in such circumstances if the court would find it helpful, we are under no obligation to do so. "It is well settled that 'Government Code section 68081 does *not* give the parties a right to submit supplemental briefs when an appellate court relies upon authority that was not briefed by the parties . . . .' " (*North American Title Co., Inc. v. Gugasyan* (2021) 73 Cal.App.5th 380, 391, fn. 7.) As construed by our Supreme Court, "[t]he parties need only have been given

4

an *opportunity* to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of section 68081." (*People v. Alice* (2007) 41 Cal.4th 668, 679 italics added.) Here, the issue is the scope of COFFA and that issue has been extensively argued in the appellate briefs.

Furthermore, Rael did brief the significance of the legal authorities in question. Because that authority consists of judicially noticeable legislative history sources, we gave the parties notice of our intention to judicially notice those materials and an opportunity to apprise us of their views as to the propriety of doing so and the tenor of the matters to be noticed. (See Evid. Code, §§ 459, 455.) Rael availed itself of that opportunity—in seven pages of legal argument concerning the legal relevance (in its view) of the matters we sought to judicially notice. It did so again in its petition for rehearing, which goes well beyond the question whether rehearing is warranted and devotes greater attention to re-arguing the merits. Nothing requires us to prolong this lengthy appeal, and impose yet further expense on the litigants, by granting Rael yet a fourth bite at the apple to tell us why the legislative history of COFFA counsels in favor of excluding personal care products such as these from the law's protections. This appeal must come to an end.

There is no change in the judgment.

Date: _____    _____

STEWART, P. J.

5

Trial Court:  Alameda County Superior Court

Trial Judge:       Hon. Stephen D. Klaus

Counsel:

Lexington Law Group, Patrick Carey and Jacob Janzen for Plaintiff and Appellant.

Rutan & Tucker, Michael D. Adams and Talya Goldfinger for Defendant and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ENVIRONMENTAL DEMOCRACY PROJECT,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>RAEL, INC.,<br><br>    Defendant and Respondent. | A170385<br><br>(Alameda County<br>Super. Ct. No. 22CV019973) |

An environmental advocacy group brought suit against the manufacturer of feminine hygiene products, alleging that some of its products are labeled and sold as "organic" and as "made with" organic ingredients in violation of California's law regulating organic products, the California Organic Food and Farming Act (COFFA), Health and Safety Code, section 110810 et seq.; Food and Agricultural Code, section 46000 et seq.[1] The trial court granted judgment on the pleadings for the manufacturer on the ground that feminine hygiene products are not subject to California's organic products law.

We reverse. We hold that COFFA applies to all products sold as "organic" or containing "organic" materials, including the feminine hygiene products at issue here.

---

[1] Except where otherwise specified all further statutory references are to the Health and Safety Code.

## BACKGROUND

Plaintiff and appellant, Environmental Democracy Project (EDP), is a California nonprofit organization dedicated to protecting the public from deceptive environmental claims regarding consumer goods. It filed this suit against Rael, Inc. (Rael), to enjoin Rael's sale of products as "organic" or "made with organic" materials in violation of COFFA (see §§ 111910, subd. (a), 110890, subd. (a)).

EDP's complaint alleges Rael sells products in California as organic or containing organic ingredients in violation of COFFA. One is Rael's "organic cotton cover period underwear," which EDP alleges Rael represents prominently in both online advertisements and on the packaging's principal display panel as "ORGANIC COTTON COVER PERIOD UNDERWEAR." According to the complaint, Rael's "[a]dvertising copy for this product states that it is " 'made with certified Texas organic cotton' and a '100% Certified Organic Cotton Cover Sheet.' " EDP alleges that "[p]roducts sold as organic in California must contain a minimum of 95% certified organic materials by weight or fluid volume, excluding water and salt. Health & Safety Code § 110820; 7 C.F.R. § 205.301(b)" and that "[p]roducts sold as made with specific organic materials (e.g. 'made with organic cotton') must contain a minimum of 70% certified organic materials by weight or fluid volume, excluding water and salt. Health & Safety Code § 110820; 7 C.F.R. §§ 205.301(c)." Rael's packaging and advertising of the period underwear allegedly violate section 110820 because the product contains "far less than 70% certified organic materials (excluding water and salt), let alone 95% certified organic materials (excluding water and salt) . . . and contain several nonagricultural and nonorganically produced agricultural products that are

not expressly permitted by the NOP."[2]  The underwear also contains "several nonagricultural and nonorganically produced materials" that EDP alleges are not legally permitted to be included in products marketed as organic or as made with organic ingredients, "such as 'Natural Wood Pulp Core with Super Absorbent Polymers,' 'Polyethylene,' 'Polypropolene,' [*sic*] 'Elastics,' and 'Waterproof Backing.' "

The complaint includes several images of the underwear's packaging and advertising:



---

[2]  NOP is an acronym for the federal National Organic Program, 7 Code of Federal Regulations parts 205.1-205.699.  EDP alleges that COFFA extends the standards of the NOP "to all products that are sold as organic or as containing organic materials in California."  (See Food & Agr. Code, § 46002, subd. (a) ["All organic food or product regulations and any amendments to those regulations adopted pursuant to the federal Organic Foods Production Act of 1990 . . . shall be the organic food and product regulations of this state"]; § 110956, subd. (a) [similar].)



Another example is Rael's "organic cotton cover pads," which allegedly contain less than 70 percent certified organic materials but are advertised and represented on their principal display panel and in advertisements as "organic." In addition, online representations allegedly state the pads are made with "plush organic cotton," and "Made With . . . organic cotton." And like the underwear, the pads allegedly contain materials that are not legally permitted to be included in products marketed as organic or as made with organic ingredients. Again, the complaint includes images:





EDP alleges similar details concerning a third product, Rael's "organic cotton cover panty liners," which despite allegedly being advertised and represented as "organic" and made with "100 % certified organic cotton from Texas" are comprised of only 20 percent organically grown cotton and made with materials not legally permitted to be included in products marketed as organic or as made with organic ingredients.  The complaint includes an

image of this product too:



Rael moved for judgment on the pleadings, arguing COFFA does not apply to personal care products but only to agricultural products, cosmetics and pet food. The trial court agreed, and on that basis granted judgment on the pleadings. It ruled that COFFA "appears to be intended to incorporate federal regulations and expand coverage [beyond the coverage of federal law]" but only "to specified products, not every product sold, such as the personal hygiene products involved here." EDP timely appealed the resulting judgment.

## DISCUSSION

As it did in the trial court, EDP argues that COFFA governs all products sold in California without exception, and thus that the trial court

erred in rejecting its claim. It asserts this conclusion is mandated by the statute's plain language which it contends is not ambiguous, and that the statute's legislative history, even if relevant, confirms the statute's broad scope.

Rael continues to assert that COFFA does not apply to "personal care products," including its period care products. It asserts that the Legislature's only purpose in enacting COFFA was to bring California in line with national organic labeling standards that apply only to agricultural products, "not to drastically expand those standards to every product which is now or ever will be in existence."

As EDP asserts, we review this issue independently, as a question of law. (*Davis Boat Manufacturing-Nordic, Inc. v. Smith* (2023) 95 Cal.App.5th 660, 672 [" ' "Questions of statutory interpretation . . . present questions of law, which we review de novo" ' "].) Although both parties focus mostly on the trial court's reasoning, " ' "an appellate court is not bound by the trial judge's interpretation [of a statute].' [Citation.] Instead, 'we undertake our own interpretation of the determinative statute and assess any claims raised by the parties completely anew." ' " (*Ibid.*)

## I.

### *Principles of Statutory Interpretation*

" 'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*In re Ja.O.* (2025) 18 Cal.5th 271, 283; see also Code Civ. Proc., § 1859.) "In interpreting a statutory provision, 'our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary

7

results." (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385 (*Poole*).)

Our first step is to engage in a " 'contextual reading of the statute's language.' " (*Dr. Leevil, LLC v. Westlake Health Care Center* (2018) 6 Cal.5th 474, 478 (*Dr. Leevil, LLC*).) As summarized by our Supreme Court, " 'We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose.' [Citation.] 'We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme.' [Citation.] 'The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.' " (*In re Ja.O.*, *supra,* 18 Cal.5th at p. 283; accord, *Dr. Leevil, LLC*, at p. 478 [" 'We begin with the text, construing words in their broader statutory context and, where possible, harmonizing provisions concerning the same subject' "]; *Poole*, *supra,* 61 Cal.4th at p. 1384 [statutory interpretation " ' "begin[s] with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent" ' "].)

In conducting this analysis, we may neither insert language nor ignore any. " '[O]ur office is simply to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language.' " (*Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 807.)

8

"If the statutory 'text is unambiguous and provides a clear answer, we need go no further.' " (*In re Ja.O.*, *supra,* 18 Cal.5th at p. 283.)  In such a case, "courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend."  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737; accord, *Poole, supra,* 61 Cal.4th at pp. 1384-1385 [" 'The plain meaning controls if there is no ambiguity in the statutory language' "].)  Only if the statutory text "supports more than one reasonable construction" do we consider extrinsic sources, including legislative history and public policy.  (*In re Ja.O.,* at p. 283.)

With these principles in mind, we turn first to the statutory text, examining both the overall statutory scheme as well as the particular language of the provisions here at issue.

## II.

### *Statutory Overview*

#### A.    Introduction

Regulation of organic products has evolved over nearly five decades and is governed by both federal and state law.  (See generally *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 304-307 (*Quesada*).)

In 1979, the Legislature enacted the Organic Foods Act of 1979. (*Quesada, supra,* 62 Cal.4th at p. 305; see Stats. 1979, ch. 914, pp. 3143-3149 [former §§ 26469, 26569.11–26569.13, 26569.15–26569.17, 26850.5–26850.6].) That early law was amended a number of times, but over the decades applied only to "food."  (See West's Ann. Health & Saf. Code (2002 ed.) former §§ 110820 [organic food requirements] 110830 [labeling]; see also former § 110880 [application of article within California].)  As later summarized by the Legislative Counsel, it provided "that no food shall be sold as organic

9

unless it meets certain criteria, as specified, and accurate and specific records are kept detailing its production, handling, and sale." (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Stats. 2002, ch. 533, Summary Dig., p. 208.) In 1992, the Legislature added seed, fiber and horticultural products to the statute. (Stats. 1992, ch. 1004, § 5 (Assem. Bill No. 3247); see Food & Agr. Code, § 46014.)

In 1990, Congress enacted the federal Organic Foods Production Act of 1990, 7 U.S.C. § 6501 et seq. (the federal Act) "to establish national standards governing the marketing of certain agricultural products as organically produced products." (*Id.*, § 6501(1).) (See Pub. L. No. 101-624, tit. XXI, § 2102 (Nov. 28, 1990) 104 Stat. 3359.) The federal Act directed "the establishment of national baseline standards for the production, labeling, and sale of organic products." (*Quesada*, *supra*, 62 Cal.4th at p. 306.) It left the task of defining organic production to the U.S. Department of Agriculture (USDA). (*Id.*; see 7 U.S.C. §§ 6517-6518, 6521(a).)

The federal Act regulates only products "marketed . . . for human or livestock consumption" (which it refers to as "agricultural products"). (See 7 U.S.C. § 6502(1) [defining "agricultural product"; 7 C.F.R. § 205.2 [same].) Federal regulators have repeatedly concluded that the federal Act does not cover personal care products, including cosmetics.[3] (See generally, legislative

---

[3] Nevertheless, such products can obtain voluntary certification under federal law if they comply with federal standards. The USDA's official position is that, although the U.S. Food and Drug Administration "**does not** define or regulate the term 'organic,' as it applies to cosmetics, body care, or personal care products," any such product "may be eligible to be certified under the NOP regulations" if it " 'contains or is made up of agricultural ingredients, and can meet the USDA/NOP organic production, handling, processing and labeling standards." (See <https://www.ams.usda.gov/grades-standards/cosmetics-body-care-and-personal-care-products> [as of Nov. 26,

history discussed in *All One God Faith, Inc. v. Hain Celestial Group, Inc.* (N.D. Cal., Sept. 22, 2011, No. C 09-03517 JF (HRL)) 2011 WL 4433817, at *3-*5.) However, the federal Act allowed states to enact their own organic regulatory programs and, subject to U.S.D.A. approval, set more stringent standards. (*Quesada, supra,* 62 Cal.4th at p. 306; see 7 U.S.C. § 6507.)

In 2002, effective in 2003, the Legislature enacted the California Organic Products Act of 2003 (COPA). (Stats. 2002, ch. 533 (Assem. Bill No. 2823).) One purpose was to implement the provisions of federal law at the state level, after the federal government had issued its final rule adopting regulations that established the NOP. (See *Quesada, supra*, 62 Cal.4th at p. 306 [USDA issued final rule adopting implementing regulations in 2000]; 65 Fed.Reg. 80548 (Dec. 21, 2000).) COPA did so by "incorporat[ing] by reference federal regulations under the Organic Products Act." (*Quesada*, at p. 307; see Stats. 2002, ch. 533, § 1 [amending Food & Agr. Code, § 46000]; Stats. 2002, ch. 533, § 4 [adding Food & Agr. Code, § 46002]; Stats. 2002, ch. 533, § 68 [amending § 110956 to add reference to NOP]; see also Stats. 2002, ch. 533, § 40 [adding § 110811 providing that article shall be interpreted in conjunction with, inter alia, NOP regulations]; Stats. 2002, ch. 533, § 41 [adding § 110812 providing that Director of Department of Health Services shall enforce regulations promulgated by NOP and provisions of COPA].)[4]

_____

2025].) "Once certified, cosmetics, personal care products, and body care products are eligible for the same 4 organic labeling categories as all other agricultural products, based on their organic content and other factors." (*Ibid*.)

[4] The Legislature had anticipated the issuance of final regulations even earlier when, in 1996, it adopted section 110956 of the Health and Safety Code. (See Stats. 1996, ch. 1023, § 310.) As originally enacted, that provision stated: "(a) All organic food regulations and any amendments to

11

COPA was also intended to go beyond federal law in certain respects. As set forth in the Legislative Digest for every version of the bill, COPA would "broaden the application of [existing law] *to all organic products* whether 100% organic or made with organic ingredients, including food, pet food, nonfood plants, and cosmetics and provide that *no product* may be sold as organic unless it is produced in accordance with the regulations of the [NOP]." (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Stats. 2002, ch. 533, italics added.) The legislation accomplished this in part by replacing the words "food" and "foods" with "product" and "products" in the statute's operative provisions. (Compare Stats. 1999, ch. 609 (Assem. Bill No. 1243) §§ 24, 25 [1999 version of sections 110820 and 110835]; Stats. 1995, ch. 415 (Sen. Bill No. 1360) § 6 [adding §§ 110810, 110815, subd. (r), 110830, 110840, 110845, 110850, 110870, 110875, subd. (a),110880, 110885, 110890, 110895, 110900, 110910, 110930, 110940]; and Stats. 1996, ch. 1023 (Sen. Bill No. 1497) §§ 310-311 [adding §§ 110956 and 110957] with Stats. 2002, ch. 533, §§ 39, 42, 44, 48, 49, 54-64, 66-69 [2002 version of sections 110810, 110815, subd. (k), 110820, 110830, 112835, 110840, 110845, 110850,

---

those regulations adopted pursuant to the Organic Foods Production Act of 1990 (7 U.S.C. Sec. 6501 et seq.), that are in effect on the date this bill is enacted or that are adopted after that date shall be the organic food regulations of this state. [¶] (b) The department may, by regulation, prescribe conditions under which organic foods may be sold in this state whether or not these conditions are in accordance with regulations adopted pursuant to the Organic Foods Production Act of 1990 (7 U.S.C. Sec. 6501 et seq.) if the director submits these regulations for approval to the federal Secretary of Agriculture as required by Section 6507 of Title 7 of the United States Code and the Secretary approves the regulations pursuant to the federal Organic Foods Production Act." (Stats. 1996, ch. 1023, § 310.)

12

110870, 110875, subd. (a),110880, 110885, 110890, 110895, 110900, 110910, 110930, 110940, 110956, 110957].)

The bill broadened its reach beyond the federal Act in other ways. For example, it permitted the Secretary of California's Department of Food and Agriculture "to adopt regulations allowing or prohibiting the use of substances in the processing of products that are exempt under the [NOP], cosmetics, and animal food sold as organic." (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Stats. 2002, ch. 533.) It also added specific provisions governing the content of cosmetic products. (See §§ 110838, subd. (a), 110839; Stats. 2002, ch. 533, §§ 50, 51.) And it expanded the requirement under existing law "that persons engaged in the production or handling of raw agricultural products sold as organic or the processing or handling of processed food sold as organic [to] register with the Secretary of the Department of Food and Agriculture" "to cover persons engaged in processing or handling dietary supplements, alcoholic beverages, animal food, and cosmetics sold as organic." (Legis. Counsel's Digest, Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Stats. 2002, ch. 533.)

COPA was codified in sections 46000 through 46029 of the Food and Agriculture Code and sections 110810 through 110959 of the Health and Safety Code. The provisions at issue in this case are codified in the Health and Safety Code.

In 2016, the Legislature amended COPA, renaming those provisions that are found in the Food and Agriculture Code, the "California Organic Food and Farming Act" (COFFA). (Stats. 2016, ch. 403 (Assem. Bill No. 1286), § 2 [amending Food & Agr. Code, § 46000].) In 2020, it made a conforming name change to the relevant provisions of COPA located in the Health and Safety Code, also renaming them COFFA. (Stats. 2020, ch. 302,

13

§ 9 [amending § 110810].)  Neither the 2016 nor the 2020 amendments repealed or revised the many sections of the Health and Safety Code that COPA had broadened from food to products.

Hereafter, we will refer to the entire statutory framework as COFFA, but when specifically referring to the 2002 amendments will use the name COPA, which it was called at that time.

COFFA prescribes standards for products that are "sold as organic," which means "any use of the terms 'organic,' 'organically grown,' or grammatical variations of those terms . . . in connection with any product grown, handled, processed, sold, or offered for sale in [California], including, but not limited to, any use of these terms in labeling or advertising of any product and any ingredient in a multi-ingredient product."  (§ 110815, subd. (k).)  No product may be sold, offered for sale, advertised or labeled in violation of the law.  (§ 110890, subd. (a).)  In addition, broadly stated, COFFA confers authority on the Director of the Department of Health Services to adopt implementing regulations (§§ 110835, 110950, 110956; see also § 110815, subd. (b)) and to enforce COFFA as well as federal regulations under the NOP (§§ 110812, 110956, subd. (a); see also §§ 110915, 110930, 110940); establishes requirements for the certification of organic products (§§ 110850-110870, 110895), registration of producers, processors and handlers of organic products (§§ 110875, 110900, 110958, 110959) and record-keeping (§§ 110840, 110845, 110905); and regulates substances and materials that are acceptable and prohibited (see §§ 110815, subd. (i), 110818, 110825, 110835, 110910).

Importantly for purposes here, section 110880 states that the law applies to "all products sold as organic within [California], wherever

14

produced, handled, or processed, and to all products produced, that are handled or processed in [California], wherever sold as organic."

As relevant here, no product may be sold as organic unless it meets COFFA's requirements for the percentage of organic material in, and the labeling of, products sold as organic. (§§ 110820, 110830). EDP asserts that Rael's feminine hygiene products violate both aspects of COFFA. We now turn to those provisions.

## B. The provisions at issue

Section 110820. One of the two sections of COFFA that EDP alleges Rael's feminine hygiene products violate is section 110820. In full, it states: "Except as otherwise provided in this article, no product shall be sold as organic pursuant to this article unless it is produced according to regulations promulgated by the NOP, and consists entirely of products manufactured only from raw or processed agricultural products except as follows: [¶] (a) Water, air, and salt may be added to the product. [¶] (b) Ingredients other than raw or processed agricultural products may be added to the product if these ingredients include nonagricultural substances or nonorganically produced agricultural products produced in a manner consistent with, or which are on the national list adopted by the United States Secretary of Agriculture pursuant to Section 6517 of the NOP *and do not represent more than 5 percent of the weight of the total finished product, excluding salt and water*."[5] (§ 110820, italics added.)

_____

[5] Cosmetics sold as organic are subject to less stringent content requirements. (See § 110838, subds. (a), (b) [at least 70 percent organically produced ingredients, by weight or volume]; § 110839 [multi-ingredient cosmetic products].)

The provisions of COFFA codified in the Health and Safety Code are part of the Sherman Food, Drug, and Cosmetics Laws (see Health & Saf.

15

EDP alleges that Rael's products contain far less than 95 percent certified organic materials and thus its sale, labeling, and representation of its products as "organic" violates COFFA.

Section 110830.  The second provision Rael's products allegedly violate is section 110830, governing labeling.  That section states:  "(a) No product handled, processed, sold, advertised, represented, or offered for sale in this state, shall be sold as organic unless it also is prominently labeled and invoiced with similar terminology as set forth by regulations promulgated by the NOP. [¶] (b) No product may be advertised or labeled as 'organic when available' or similar terminology that leaves in doubt whether the food is being sold as organic."  (§ 110830.)

EDP asserts that pursuant to section 110830, COFFA incorporates the standards set forth in a federal NOP regulation that establishes a four-tier structure governing the content and labeling requirements for agricultural products that are sold, labeled or represented as organic in whole or in part. (See 7 C.F.R. § 205.301.)  That federal regulation, entitled "Product Composition," specifies that agricultural products (1) may be "sold, labeled or represented" as "100 percent organic" only if they are comprised entirely of organic ingredients (*id.,* § 205.301(a); see also *id.*, § 205.303 [labeling requirements]); (2) may be "sold, labeled or represented" as "organic" only if they are comprised of at least 95 percent organic ingredients (*id.,* § 205.301(b); see also *id.*, § 205.303); (3) may be "sold, labeled or represented"

Code, div. 104, part 5), which defines "cosmetics" as "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance" except that "[t]he term 'cosmetic' does not include soap." (§ 109900.)

16

as "made with organic" ingredients only if they are comprised of at least 70 percent organic ingredients (*id.,* § 205.301(c); see also *id.* § 205.304); and (4) that agricultural products with less than 70 percent organic ingredients may only identify the organic ingredients in the ingredient statement (*id.,* § 205.301(d); see also *id.,* § 205.305(a)). EDP alleges that Rael's feminine hygiene products violate those aspects of COFFA that it contends incorporate these federal NOP standards.[6]

### III.

### *COFFA's Text and Structure*

As we have noted, Rael's sole argument is that COFFA does not apply *at all* to feminine hygiene products. Therefore, we are not called on to determine the meaning or application of any of COFFA's specific substantive requirements. The only question before us is COFFA's intended scope.

Looking first to the words of the provisions at issue, as we must, both sections 110820 and 110830 apply broadly to "products," without exception. As noted, section 110820 states that "[e]xcept as otherwise provided in this article, *no product* shall be sold as organic pursuant to this article" unless, among other requirements, it contains no more than five percent non-organic ingredients by weight. (Italics added.) Likewise, section 110830 governing labeling states "*No product* handled, processed, sold, advertised, represented, or offered for sale in this state, shall be sold as organic unless it also is prominently labeled and invoiced with similar terminology as set forth by regulations promulgated by the NOP." (§ 110830, subd. (a), italics added.) And a more general provision, section 110880, addresses COFFA's intended

---

[6] EDP asserts the incorporation of federal standards is also accomplished by section 110820, discussed *ante,* p. 15.

17

scope:  as noted, it states that COFFA applies to "*all* products sold as organic within [California], wherever produced, handled, or processed, and to all products produced, that are handled in [California], wherever sold as organic."  (Italics added.)  On their face, these statements are straightforward and do not appear to leave room for judicially developed, implied exceptions, such as one for feminine hygiene products.

That conclusion is supported by the meaning of the word "product," a term COFFA does not define.  "Absent 'a specific statutory definition of [that phrase,] we may "look to [its] plain meaning . . . as understood by the ordinary person, which would typically be a dictionary definition." ' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1035.)  A review of several dictionaries shows that its plain meaning is not restricted to a particular type of good or item but, rather, pertains broadly to anything that is intended to be made commercially available.  For example, the word "product" is defined as "something that is made to be sold, usually something that is produced by an industrial process or, less commonly, something that is grown or obtained through farming" (Cambridge Dict. Online (2025) <https://dictionary.cambridge.org/us/dictionary/english/product> [as of Nov. 26, 2025].)  Similarly, one definition given by the Oxford English Dictionary is, "That which is produced by any action, operation or work; a production; the result.  Now freq[uently] that which is produced commercially for sale."  (12 Oxford English Dict. (2nd ed. 1989) p. 565; see also Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/product> [as of Nov. 26, 2025] ["(1) something produced [¶] especially:  commodity" and (2) something (such as a service) that is marketed or sold as a commodity"].)  In short, the plain meaning of "product"

18

is expansive enough to encompass—not exclude—personal care products such as those at issue here.

COFFA also modifies the word "product" with plain language indicating expansive application, without limitation in sections 110820 and 11830 themselves ("no product"). Moreover, COFFA defines the phrase "sold as organic" as the use of specified terminology (i.e., "organic," "organically grown" or their grammatical variants) "in connection with *any product* grown, handled, processed, sold, or offered for sale in this state, including but not limited to, any use of these terms in labeling or advertising of *any* product and any ingredient in a multi-ingredient product." (§ 110815, subd. (k), italics added.) This definition, too, plainly connotes the breadth of COFFA's coverage. (See, e.g., *Burks v. Poppy Const. Co.* (1962) 57 Cal.2d 463, 468.)

Following our high court's guidance, we do not stop with the language of the provisions directly implicated in this case but also must consider that language in the context of the overall statutory scheme. (See *In re Ja.O.*, *supra*, 18 Cal.5th at p. 283; *Dr. Leevil, LLC, supra*, 6 Cal.5th at p. 478; *Poole, supra*, 61 Cal.4th at p. 1384.) Looking at the statute as a whole, we see the same kind of broad unlimited usage of the word "product" in numerous operative terms of the statute. (E.g., §§ 110850, subd. (a) ["*all products* sold as organic in California shall be certified" by accreditation association, italics added]; 110890 [unlawful for any person to "sell, offer for sale, advertise, or label *any product* in violation of this article," italics added].) In addition, as we have pointed out, the Legislature globally replaced the words "food" or "foods" with the words "product" or "products" in twenty or more distinct provisions of the statute when it enacted COPA, and COFFA did not undo any of this. (See *ante*, pp. 12-14.)

19

In short, the statute as a whole indicates the Legislature intended to include, and did include, all products sold as organic under its umbrella. There is no indication that it meant to exclude personal care products from regulation.

Here, Rael does not say what the term "product" means nor argue the term itself is ambiguous. Rather, it points to several features of the statutory scheme that it says demonstrate that "all products" does not mean personal care products. Most are not persuasive, but one reveals an arguable ambiguity.

First, Rael cites specific provisions governing cosmetics which impose different and less stringent standards than federal regulations impose on products that are governed by federal law (i.e., products marketed for human or livestock consumption (see 7 U.S.C. § 6502(1))). (Cosmetic products are not covered by the NOP at all, other than through voluntary compliance and certification. [See *ante*, pp. 10-11].) Rael points out that, unlike federal law, which requires products sold as "organic" ("but not as 100 percent organic") to contain at least 95 percent organically produced ingredients (see 7 C.F.R. § 205.301(b)), COFFA requires cosmetics sold as organic to contain only 70 percent organically produced ingredients (see § 110838, subd. (a)).[7] Rael also cites section 110839, which limits how the organic ingredients in multi-ingredient cosmetic products with less than 70 percent organically produced ingredients may identify the organic ingredients (i.e., only on the ingredients

---

[7] See § 110838, subd. (a) ("Cosmetic products sold, labeled, or represented as organic or made with organic ingredients shall contain, at least 70 percent organically produced ingredients"); compare 7 C.F.R. § 205.301(b)&(c) (for raw agricultural products sold as organic, 95 percent; for those sold as "made with organic" ingredients, 70 percent if sold as made with organic ingredients).

20

label and information panel).[8]  On the basis of these provisions, Rael argues that where COFFA departs from federal law "it does so explicitly."

We are not persuaded.  COFFA's specific provisions governing cosmetics may be harmonized with its more general provisions governing product composition and labeling.  Section 110820 which, as explained, requires products sold as organic to contain 95 percent minimum organic content, states that its requirements apply "[e]xcept as otherwise provided in this article."  Section 110838, subdivision (a) plainly "otherwise provide[s]" by specifying only a 70 percent minimum for cosmetics.  As EDP puts it, the latter statute governing cosmetics is clearly a carveout of cosmetic products to section 110820's minimum organic content requirements and supplants that with a less stringent standard.  Section 110830, governing product labeling (which we discuss further, *post*, pp. 28-32), contains no similar qualifying language (i.e., "except as otherwise provided in this article"); nevertheless, to the extent those general labeling requirements conflict with the more particular requirements of section 110839 governing cosmetics labeling, the latter statute would apply.  (See *Edais v. Superior Court* (2023) 87 Cal.App.5th 530, 542 [where there is conflict," ' " 'more specific provisions take precedence over more general ones' " ' "].)  Thus, COFFA's explicit

_____

    [8]  Section 110839 states:  "Multi-ingredient cosmetic products sold as organic in California with less than 70 percent organically produced ingredients, by weight or by fluid volume, excluding water and salt, may only identify the organic content as follows: [¶] (a) By identifying each organically produced ingredient in the ingredient statement with the word 'organic' or with an asterisk or other reference mark that is defined below the ingredient statement to indicate the ingredient is organically produced. [¶] (b) If the organically produced ingredients are identified in the ingredient statement, by displaying the product's percentage of organic contents on the information panel."

21

provisions concerning cosmetics create no ambiguity as to the breadth of COFFA's intended scope regarding other products more generally.

On the contrary, far from supporting a narrow construction of COFFA, the Legislature's explicit carveout for cosmetics demonstrates that it knew how to single out a specific category of product for distinct treatment. It singled out cosmetics but created no similar carveout or special standards for personal care products (or any other category of "product," for that matter) from its explicit statutory mandate that COFFA applies to "all products" subject to the law's territorial reach (§ 110880).

Second, Rael cites section 110838, subdivisions (b), (c) and (d) which specify how to calculate the percentage of organic ingredients in "an agricultural product."[9] It asserts that COFFA contains no express provision

_____

[9] Those provisions state:

"(b) The percentage of all organically produced ingredients in an agricultural product sold, labeled, or represented as 'organic' or '100 percent organic,' or sold, labeled, or represented as being made with organic ingredients or food groups, or as inclusive of organic ingredients, shall be calculated as follows: [¶] (1) For products containing organically produced ingredients in solid form, by dividing the total net weight of combined organic ingredients at formulation, excluding water and salt, by the total weight of the finished product, excluding water and salt. [¶] (2) For products containing organically produced ingredients in liquid form, by dividing the fluid volume of all organic ingredients, excluding water and salt, by the fluid volume of the finished product, excluding water and salt. If the liquid product is identified on the principal display panel or information panel as being reconstituted from concentrates, the calculation should be made on the basis of single-strength concentrations of the ingredients and finished product. [¶] (3) For products containing organically produced ingredients in both solid and liquid form, by dividing the combined weight of the solid ingredients and the weight of the liquid ingredients, excluding water and salt, by the total weight of the finished product, excluding water and salt.

"(c) The percentage of all organically produced ingredients in an agricultural product must be rounded down to the nearest whole number.

22

for calculating organic percentages in products other than "agricultural products," and that these provisions of section 110838 do not apply to period care products. To the extent Rael is implying that these provisions of section 110383 create some ambiguity in the scope of COFFA, we do not agree, for several reasons.

In the first place, Rael's assertion that period care products are not "agricultural products" governed by section 110838 subdivisions (b) through (d) is unexplained, and it is far from clear that this assumption is warranted. Unlike federal law (see 7 U.S.C. § 6502(1)), COFFA does not define the phrase "agricultural product." We have already discussed the breadth of the term "product" as used in the statute, and the term "agricultural" likewise is broad. The plain meaning of "agricultural" is "relating to agriculture,"[10] which in turn means "the science, art, or practice of cultivating the soil, producing crops, and raising livestock and in varying degrees the preparation and marketing of the resulting products." (See Merriam-Webster Online Dict. <https://www.merriam- webster.com/ dictionary/agriculture> [as of Nov. 26, 2025].) Giving the phrase its plain meaning, cotton is clearly an "agricultural" product because it is derived from (i.e., "relat[es] to") the cultivation of crops. Under this broad definition, a product *containing* such a substance—such as, here, Rael's period care product line containing cotton— is an "agricultural product" (or, at least, it is far from clear to us that it is

"(d) The percentage of all organically produced ingredients in an agricultural product must be determined by the handler who affixes the label to the consumer package and verified by the handler's certifying agent. The handler may use information provided by the certified operation in determining the percentage." (§ 110838.)

[10] See Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/agricultural> (as of Nov. 26, 2025).

23

not). Indeed, if it were not there would be no need for section 110838 to specify the method of calculating the percentage of organic material agricultural products contain.

In asserting that its period care product line is not an "agricultural product" governed by the calculation provisions of section 110838, Rael's theory necessarily must be either that an "agricultural product" is only one that consists *solely or primarily* of agricultural commodities (a definition that would exclude cosmetics too), or that California law incorporates and adopts the limited definition under federal law of "agricultural product" (that is, a product "marketed . . . for human or livestock consumption" (7 U.S.C. § 6502(1)). Rael has not explained which of these two assumptions is the basis for its position about the limited scope of section 110838 but neither assumption is warranted.

Concerning the first, Rael has not explained why the phrase "agricultural products" must be construed as only those products consisting solely or primarily of agricultural commodities, nor offered any authority for that limitation.[11] On the contrary, COFFA regulates use of the term "organic" for "*any product"* which expressly includes "any *ingredient* in a multi-ingredient product." (§ 110815, subd. (k), italics added.) COFFA limits the kind and quantity of nonagricultural material that may be included in "products" marketed as "organic," but it does not exclude any multi-

---

[11] Not even federal law contains this limitation. As noted, the term "agricultural product" under federal law means "any agricultural commodity or product, whether raw or processed, including any commodity or product derived from livestock that is marketed in the United States for human or livestock consumption." (7 U.S.C. § 6502(1).)

24

ingredient products from the law's coverage. Neither does the NOP.[12] If they did, there would be no need for either state or federal law to specify the types and percentages of nonagricultural substances a product marketed as organic may contain, because, by definition, it could not contain any.

Nor is it clear that Rael's second possible assumption is warranted: that COFFA's use of the phrase "agricultural product" in this section merely incorporates the NOP definition's limitation of that phrase to products "marketed for human or livestock consumption" (see 7 C.F.R. § 205.2). As we have said, COPA broadened the state law to replace the word "food" with "products" in numerous provisions. Restricting section 110838 subdivisions (b) through (d) to the federal definition of "agricultural product" would be in considerable tension with such changes. Furthermore, the text and structure of section 110838 suggest the Legislature did not intend to restrict the phrase "agricultural products" to products marketed for human or livestock consumption. Section 110838 not only articulates the methodology for calculating the percentage of organically produced ingredients in an "agricultural product" marketed as organic (see § 110838, subds. (b) through (d)), it also, as explained, specifies a lower threshold of 70 percent for organic content in cosmetic products sold as organic (see *id.*, subd. (a)). The fact that the Legislature addressed both subjects in the same section implies that the Legislature viewed cosmetics as an "agricultural product" too, even though

---

[12] Under the NOP, "agricultural products" include products that have multiple ingredients, some of which may be nonagricultural. (See 7 C.F.R. § 205.301 [specifying circumstances in which certain "nonagricultural substances" "may be used as ingredients and in or on a processed agricultural product labeled as 'organic' or 'made with' [organic ingredients]"].)

cosmetic products are not generally marketed for human or livestock consumption.

Ultimately, however, we need not resolve the scope of subdivisions (b) through (d) of section 110838. Because even if the Legislature had in some way limited the meaning of "agricultural products" as used in those subsections to exclude some products, we would not agree with Rael's argument. That is, assuming arguendo that those subsections are limited in scope, the absence of specific guidance for calculating the organic composition of nonagricultural "products" would not create an ambiguity as to breadth of COFFA's coverage. As noted, COFFA states that it applies to "all products" sold as organic within California (or sold anywhere as organic that are handled in California). (See § 110880.) Even under a more limited understanding of the phrase "agricultural product," cosmetics are no more an "agricultural product" than menstrual products and yet they are plainly covered by COFFA.[13]

---

[13] Assuming that subsections (b) through (d) are limited in scope in some way, we also do not need to decide how the Legislature intended such calculations to be made for products other than "agricultural products," but we perceive at least two possible answers. One is that the Legislature intended to leave a gap and thereby confer discretion as to the manner of calculating such percentages in products other than "agricultural products" as so defined. A second is that it intended to adopt the NOP methodology for calculating such percentages and apply that methodology to products other than "agricultural products." COFFA is reasonably susceptible to the latter construction because it states that it is to "be interpreted in conjunction with" NOP regulations (§ 110811), and those regulations specify how to calculate the percentage of organic ingredients in "an agricultural product" in terms nearly identical to those of section 110838. (See 7 C.F.R. § 205.302.) The issue is not directly before us, however, and we do not resolve the question.

Changing tack, Rael also argues COFFA does not include any *percentage* requirements for organic ingredients in categories of products other than cosmetics, and so under the maxim *expressio unius est exclusio alterius*, the fact that COFFA contains percentage requirements only for cosmetics—"a clear departure from the NOP—shows that there is [*sic*] no such requirements for personal care products." That interpretive maxim, which means " 'the expression of one thing in a statute . . . ordinarily implies the exclusion of other things,' " " 'is not applied in isolation' " and does not apply " ' " 'if its operation would contradict a discernable and contrary legislative intent.' " ' " (*Greisman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1324.) Here the maxim is inapplicable because again Rael's premise is mistaken: it overlooks the percentage requirements that are expressly stated in section 110820, quoted *ante*, p. 15. That section states that "[e]xcept as otherwise provided in this article," no product shall be "sold as organic" unless, among other things, it "consists entirely of products manufactured only from raw or processed agricultural products except as follows" and then specifies the circumstances in which "[i]ngredients other than raw or processed agricultural products may be added to the product." (§ 110820.) Subdivision (b) specifies, among other requirements, that such ingredients must "not represent more than 5 percent of the weight of the total finished product, excluding salt and water." (§ 110820, subd. (b).) In other words, as EDP notes, COFFA generally specifies a 95 percent minimum organic composition requirement for products sold as organic. And EDP alleges that Rael's products violate COFFA because they contain less than 95 percent organic material.

That provision alone is dispositive of Rael's "no percentage requirements" argument, but there is more. Section 110820's express

27

requirement that products sold as organic contain 95 percent organic material is just one aspect of a multi-tiered state law framework that, paralleling federal law, governs the labeling of organic products depending on the amount of organic material they contain.

As explained, EDP asserts that COFFA incorporates the standards set forth in federal labeling regulations that, among other things, require either 95 percent or 70 percent minimum organic content depending on whether the product is marketed as organic or marketed simply as containing organic ingredients, and applies those standards more broadly to all products (and that the organic content of Rael's products fall well below either threshold). (See 7 C.F.R. § 205.301(b) [95 percent], subd. (c) [70 percent].) Rael disagrees with that construction. It asserts that state law's references to NOP regulations do no more than ensure that products *that are governed by NOP regulations* must comply with those regulations in order to be sold in California.

We agree with EDP: namely, that COFFA adopts the labeling standards set forth in federal NOP regulations we have discussed (see 7 C.F.R. §§ 205.301, 205.303, 205.304, 205.305, discussed *ante*, pp. 16-17) and makes them applicable to all products that are governed by COFFA, not just products governed by federal law (i.e., agricultural products for human or livestock consumption (see 7 U.S.C. § 6502(1); 7 C.F.R. § 205.2)). As noted, subdivision (a) of section 110830 states: "No product handled, processed, sold, advertised, represented, or offered for sale in this state, shall be sold as organic *unless it also is prominently labeled and invoiced with similar terminology as set forth by regulations promulgated by the NOP.*" (§ 110830, subd. (a), italics added.) In addition, section 110811 states that COFFA must be "interpreted in conjunction with" NOP regulations (§ 110811).

Interpreting section 110830 "in conjunction with" NOP regulations, the Legislature plainly intended section 110830 to incorporate the NOP standards governing "label[ing] and invoic[ing]" (namely, 7 C.F.R. § 205.301 et seq. (discussed *ante*, pp. 16-17)), and mandate more broadly that "no product" shall be sold unless it complies with those standards by utilizing "similar" (not "the same" or "the") terminology as that which the regulations specify.

Furthermore, construing subdivision (a) of section 110830 to do no more than adopt NOP labeling standards for products already governed by federal law would violate at least two canons of statutory interpretation. It would require us to rewrite that provision by inserting language the Legislature did not use, to specify: "No product handled, processed, sold, advertised, represented, or offered for sale in this state *that is subject to regulations promulgated by the NOP*, shall be sold as organic unless it also is prominently labeled and invoiced with similar terminology as set forth by regulations promulgated by the NOP." That construction is disfavored. (See Code Civ. Proc., § 1858 [courts may not "insert what has been omitted" from a statute].) Such a construction also would render the provision pointless surplusage, which likewise is a construction to be avoided. "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476; see also Code Civ. Proc., § 1858 ["where there are several [statutory] provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all"].) That is because another provision of COFFA, section 110956, subdivision (a) already adopts federal labeling standards for products that are governed by federal law by expressly adopting *all* NOP regulations. It states: "All organic

29

product regulations and any amendments to those regulations adopted pursuant to the NOP, that are in effect on the date this bill is enacted or that are adopted after that date shall be the organic product regulations of this state." (§ 110956, subd. (a); see also § 110815, subd. (g) [defining NOP].) We presume the Legislature did not intend to say the same thing twice in two different ways.

Citing the principle that "[w]here California statutes ' ". . . are, in substance, exact counterparts of the federal rules . . . the Legislature must have intended that they should have the same meaning, force and effect as have been given the federal rules by the federal courts" ' " (*Board of Education v. Unemployment Ins. Appeals Bd.* (1984) 160 Cal.App.3d 674, 686), Rael argues that in adopting COFFA the Legislature is presumed to have known that the NOP does not apply to personal care products (presumably because it covers only products marketed for human or livestock consumption) and thus intended to incorporate that limitation into COFFA. That principle does not apply. For the reasons we have discussed, section 110830, subdivision (a) is not an exact counterpart of any federal statute or federal regulation. It is a distinct aspect of a comprehensive statutory regime that was enacted with reference to a federal regime that permits states to enact standards more stringent than that of federal law (see *Quesada, supra*, 62 Cal.4th 298, 306), utilizing language that, as far as we are aware, is unique to California law. We must construe it accordingly, unfettered by a presumption it is intended to incorporate the limitations of federal law.

Accordingly, for these reasons, we conclude that section 110830 adopts *for all products governed by COFFA* the multi-tier standards for organic

30

product composition specified in federal NOP labeling standards (7 C.F.R. § 205.301 et seq.).[14]

Fourth, Rael points to subdivision (b) of section 118030 as an indication that COFFA does not apply to all personal care products. As noted, that provision states: "No product may be advertised or labeled as 'organic when available' or similar technology that leaves in doubt whether *the food* is being sold as organic." (§ 110830, subd. (b), italics added.) We acknowledge that subdivision (b)'s reference to "food" is in some tension (facially, at least) with construing COFFA more broadly. Read in isolation, it arguably supports narrowly construing COFFA only to "food." But such a construction is untenable. In light of the overall statutory scheme, the reference to "food" in

---

[14] EDP's alternative theory, raised in its complaint but not focused on in its appellate briefing, is that COFFA's adoption of federal content and labeling standards is accomplished by section 110820. We do not agree. That theory is apparently based on section 110820's requirement that products sold as organic must be "produced according to regulations promulgated by the NOP" (§ 110820, italics added). Such language appears intended only to incorporate the NOP's organic production and handling requirements (see 7 C.F.R. § 205.200 et seq.). Those regulations govern subjects such as farming and cultivation practices (*id.,* §§ 205.202–205.210), livestock production (*id.,* §§ 205.236–205.242), organic handling and processing practices (*id.,* § 206.270–206.272), and procedures for importing organic agricultural products to the United States (*id.,* § 205.273). They do not address organic product composition.

We do note, however, that interpretating section 110830 to adopt the federal standards for organic content and labeling does not conflict with the more general provision of section 110820 specifying a 95 percent minimum organic content requirement for products sold as organic. As noted, that section expressly states it governs "[e]xcept as otherwise specified in this article" (§ 110820). Reading section 110820 together with section 110830, the Legislature plainly intended to require 95 percent minimum organic content for products containing organic ingredients (under section 110820) unless the federal standard incorporated under section 110830 allows for 70 percent minimum, which depends on how the product is labeled and sold.

31

this provision cannot be construed as a limitation on the scope of COFFA because the statute's coverage is clearly and inarguably broader: at a minimum, it applies *expressly* to several nonfood products (including dietary supplements, alcoholic beverages, pet food and cosmetics (see § 110875, subd. (a)). The Legislature has mandated that the provisions of COFFA located in the Health and Safety Code be construed in conjunction with the provisions of COFFA that are located in the Food and Agriculture Code (see § 110811), where there is a provision substantively similar to subdivision (b) of section 110830 but broader. It states: "No food *or product* shall be advertised or labeled as 'organic when available,' or 'better than organic,' or use terminology that leaves in doubt whether the food *or product* being sold is organic." (Food & Agr. Code, § 46027, italics added.) The only way to make sense of subdivision (b) of section 110830 is either that it incorporates the breadth of Food and Agriculture Code section 46027, or that its reference to "food" alone (rather than "food or product" or just "product") is simply an inadvertent drafting error. "Although a court's power to effectively rewrite statutes because of drafting errors must be used with great restraint, where as here the error is clear and correction will best carry out the intent of the Legislature, we have the power to do so." (*Bonner v. County of San Diego* (2006) 139 Cal.App.4th 1336, 1346, fn. 9; see also, e.g., *Betyar v. Pierce* (1988) 205 Cal.App.3d 1250, 1257 [courts may correct inadvertent error in statute " 'to give effect to the plain intent of the legislature as deduced from the whole act then under consideration' "]; *Pond v. Maddox* (1869) 38 Cal. 572, 574-575.)

Although most of Rael's textual arguments about COFFA's intended scope are thus unpersuasive, it points to one feature of COFFA that arguably does create some ambiguity as to whether COFFA encompasses all personal

care products.  That is, it asserts that construing "products" to encompass personal care products would lead to inconsistencies in the statutory scheme regarding COFFA's registration requirements.

We agree COFFA's registration requirements found in the Health and Safety Code create potential ambiguity in an otherwise clear statutory scheme.  Under COFAA, "[i]t is unlawful for any person to produce, handle, or process products sold as organic unless duly registered pursuant to Section 110875." (§ 110900, subd. (a).)  Yet the only people who are required to be registered under section 110875 (with the Department of Health Services) are producers of organic food, beverages, supplements, pet food and cosmetics.  (See § 110875, subd. (a); see also § 110815, subd. (b).)[15]  Thus, Rael argues, COFFA cannot apply to personal care products other than cosmetics because the producers of such products are not required to register yet they would be in violation of COFFA for selling their products without being registered.  EDP asserts there is no inconsistency, because all section 110900, subdivision (a) is saying is that it is unlawful to violate section 110875, and all the latter statute is saying is that producers and sellers of *certain types* of organic products must register.

Although the question whether Rael must be registered under COFFA is not at issue here, and neither party has presented a fully developed

---

[15]  Section 110875 states that its registration requirements apply to those who are engaged in "the processing or handling of processed products for human consumption, including dietary supplements, alcoholic beverages, and fish or seafood sold as organic (except for processors and handlers of processed meat, fowl, or dairy products and retailers that are engaged in the processing or handling of products sold as organic)" and those who are engaged in "the processing or handling of animal food and cosmetics sold as organic." (§ 110875, subd. (a).)

analysis of the meaning and scope of COFFA's registration requirements (including those found in the Food and Agriculture Code (see Food & Agr. Code, § 46013.1)), both parties posit facially plausible meanings of sections 110875 and 110900.  There is no question that, as drafted, the registration requirement of section 110875 does not apply to producers and sellers of *all* types of products.  Not only is its plain language expressly limited in scope (see statutory text quoted in footnote 15, *ante,* p. 33), thereby impliedly excluding a broad range of producers from its registration requirements (such as producers of clothing, for example, or as Rael points out, producers of all personal care products other than cosmetics), but it expressly *exempts* even some food producers from having to register (i.e., "processors and handlers of processed meat, fowl, or dairy products and retailers that are engaged in the processing or handling of products sold as organic" (§ 110875, subd. (a)).

The ambiguity is section 110900's proscription making it "unlawful for any person to produce, handle, or process products sold as organic *unless duly registered pursuant to Section 110875.*"  (§ 110900, subd. (a), italics added.) This language could reasonably mean either that anyone who is not registered with the Department of Health Services under section 110875 cannot produce, handle or process organic products, or that people who are required to register under section 110875 cannot do so unless they are registered.[16]  In addition, this ambiguity begs an obvious question: why

---

[16] The term "duly" does not clarify the ambiguity.  "The word 'duly' means '[i]n a proper manner; in accordance with legal requirements.' " (*Law Finance Group, LLC v. Key* (2023) 14 Cal.5th 932, 951, quoting Black's Law Dict. (11th ed. 2019) p. 633, col. 1.)  Section 110875 specifies not only who must register but how (touching on subjects including deadlines, fees, and information required on registration forms).  (See § 110875, subds. (a), (b),

would the Legislature go to such lengths to regulate "all products sold as organic within [California], wherever produced, handled, or processed, and . . . all products produced, that are handled or processed in [California], wherever sold as organic." (§ 110880) yet require only some of them to register with the Department of Health Services and be subject to its reporting requirements (see § 110875, subd. (b))?

For purposes here, it is unnecessary to delve into the meaning, scope and intent of COFFA's registration scheme (a subject that, as said, has not been fully briefed). It suffices to conclude only that sections 110875 and 110900, read together, are somewhat facially unclear and are reasonably susceptible to either interpretation proffered by the parties. Thus, the statutory language governing COFFA's registration scheme creates some ambiguity as to COFFA's intended scope. [17]

---

(d).) Thus, as used here, section 110900 could mean either that registration under section 110875 simply has to be done in a manner that is free from procedural error ("in a proper manner"), or that registration under section 110875 is required only if section 110875 substantively requires it ("in accordance with legal requirements").

[17] Two other examples of inconsistences Rael posits are not persuasive. It argues that if COFFA applies to all products then there would be two provisions governing the percentage requirements for cosmetics (i.e., sections 110820 and 110838) which makes one superfluous. But we have already explained that the two provisions may be harmonized, with the more specific provision governing cosmetics (§ 110838) being an express exception to the more general provision governing products generally (§ 110820).

Second, Rael cites provisions of COFFA that allow for the adoption of regulations concerning products not covered by the NOP. (See §§ 110956 [conditions for selling "organic products not addressed by the [NOP]"], 110835 [allowing or prohibiting use of substances in "products that are exempt or excluded from certification under the NOP, and animal food and cosmetics sold as organic"].) It asserts that no such regulations would be needed if COFFA already applied to all products.

35

To be sure, COFFA's plain language and statutory structure strongly support a conclusion that it applies to all products, without exception.  But that construction is not free from all doubt.  And "because we cannot conclusively say there is only one reasonable way to interpret [the statute's] plain language, we next consider extrinsic sources such as legislative materials and public policy considerations."  (*In re Ja.O.*, *supra,* 18 Cal.5th at p. 238.)

---

The opposite is true.  As EDP argues, far from supporting a narrow construction of COFFA, these provisions suggest that COFFA applies more broadly than federal law, because if COFFA were limited in scope to products regulated by the NOP there would be no need to regulate products "not addressed by the [NOP]" (§ 110956) and products that are "exempt or excluded from certification under the NOP" (§ 110835).

Nor are we persuaded by the example Rael gives to illustrate its point. It cites California's regulation of cannabis pursuant to Business and Professions Code section 26062.  That statute, part of the Medicinal and Adult-Use Cannabis Regulation and Safety Act (see Bus. & Prof. Code, § 26000, subd. (a)), was adopted after California voters legalized the nonmedical use of cannabis in 2016 (see Prop. 64, as approved by voters, Gen. Elec. (Nov. 8, 2016)).  It directs the Department of Food and Agriculture by July 1, 2021, to "establish a program for cannabis that is comparable to" the NOP and COFFA.  (Bus. & Prof. Code, § 26062, subd. (a)(1).)  Rael asserts this statute would be unnecessary if COFFA already applied to all products. The illustration is inapt.  When the Legislature adopted COPA in 2002 and revised the relevant statutes to refer to "products" rather than "food," it could not reasonably have intended "products" governed by the legislation to include cannabis because at that time cannabis use was illegal (and it continues to be illegal under federal law (see 21 U.S.C. § 844(a); 21 U.S.C. § 812, schedule I(c)(10)).  That the Legislature adopted a separate regulatory regime for cannabis later, after its use was legalized under state law, sheds no light on how broadly it intended COFFA to apply to *lawful* items of commerce.

36

## A. Legislative History

The legislative history cited to us by the parties does not specifically address the subject of personal care products. Nor have the parties directed our attention to any discussion concerning the Legislature's specific reason for revising sections 110820, 110830 and 110880 to refer to "products" rather than "food" which, as explained, it did in 2002 under COPA. That 2002 legislation is key, however, because that is when the relevant language was changed, thereby implying a change in the law's intended scope. (See *Allied Premier Ins. v. United Financial Casualty Co.* (2023) 15 Cal.5th 20, 33 ["We generally infer a change in meaning from a change in statutory language"].)

The legislative history reflects that one purpose of the 2002 legislation was to bring California into compliance with federal law after issuance of the final NOP regulations.[18] For example, according to a Senate floor analysis, "[t]he adoption of the NOP regulations has placed California[] . . . out of compliance with recently established federal standards," and so the legislation "revises the Health and Safety Code . . . to conform California law to the national [NOP] regulations and codify existing state provisions regarding enforcement of the state and federal requirements regarding organic products." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Aug. 12, 2002, pp. 3-4.)

But another purpose reflected in the legislative history was to broaden state law to cover products that federal law does not regulate. For example, the same Senate floor analysis notes that "[s]tates are authorized to enact

---

[18] The trial court took judicial notice of some of the sources discussed in this analysis. After giving the parties notice, we ourselves judicially noticed the rest.

requirements that are more stringent than the federal requirements when state conditions justify such modifications of the federal standards," and notes that "[t]his bill also extends existing requirements for products that are labeled as 'organic' to other commercially available products including cosmetics." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Aug. 12, 2002, p. 4; see also Sen. Com. on Health and Human Services, analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended June 11, 2002, p. 4 [same].) It states that the bill authorizes California regulators "to prescribe conditions for organic food and products not covered by NOP that can be sold in California." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Aug. 12, 2002, p. 2 [no. 2].) ) EDP cites similar statements about the legislation's intended breadth in other legislative sources as well. (See, e.g., Assem. Com. on Appropriations, Rep. on Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Apr. 17, 2002, p. 1 ["This bill broadens, to cosmetics and other products, the authority . . . to regulate the production, handling and sale of organic products"]; Dept. of Food & Agr., Enrolled Bill Rep. on Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Aug. 12, 2002, p. 1 ["This bill would broaden the scope of the California Organic Foods Act of 1990 to include non-food items to be marketed as organic"]; *People v. Adir International, LLC* (2025) 114 Cal.App.5th 275, 324 ["Enrolled bill reports are legislative history that may be considered by courts in construing a statute"].)

Rael cites statements in legislative sources that cut the other way. For example, it cites a statement in an Assembly committee analysis suggesting that the only products the legislation is intended to cover beyond those embraced by federal law are cosmetic products. (See Assem. Com. on Agr.,

38

Analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Apr. 1, 2002, p. 3 ["this bill attempts to bring other products using the term 'organic' into the process, specifically, cosmetics"].)  It also cites another statement in the same analysis stating the legislation broadens state authority to regulate "processed food, pet food, nonfood plants and cosmetics" (*id*. at p. 1), a statement repeated in other legislative sources as well (see, e.g., Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Aug. 12, 2002, p. 1. [same]; Assem. Floor Analysis of Assem. Bill No. 2823, Sen. Conc. Amends. (2001-2002 Reg. Sess.) as amended Aug. 20, 2002, p. 1 [same].)  But the same committee report cited by Rael also indicates the legislation is broader.  It explains, "The intent of this Act is to provide consumer confidence in organically labeled products—to insure [*sic*] that the products being sold as organic, contain certified organic commodities, and that they have been handled properly to maintain their organic integrity.  *This bill will broaden the scope of the California Organic program to include cosmetics and other products*, thereby requiring them to have an audit trail and inspection and to ensure truth in labeling." (Assem. Com. on Agr., Analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Apr. 1, 2002, at pp. 3-4, italics added.)  It also states that the legislation requires state and county regulators to "enforce the regulations adopted by the NOP and this Act on *any* person selling products as 'organic.' " (*Id*. at p. 1, italics added.)  And that the legislation would "prescribe conditions for organic food *and products not covered by NOP* that can be sold in California." (*Id*. at p. 1, italics added.)

At best, the legislative history cited to us by the parties about the law's intended scope is inconclusive.  So too is the Legislative Counsel's Digest, which contains some comments that support a broad, all-inclusive

39

interpretation of the law's scope[19] as well as some ambiguous comments that suggest a somewhat narrower scope.[20]  Yet nothing in the legislative history cited to us contains any discussion about, or justification for, excluding any personal care products from the law's coverage (or for limiting the law's coverage to only certain kinds of products).  (See *In re Ja.O.*, *supra*, 18 Cal.5th at p. 290 [noting in such a case that statute's legislative history "support[s] interpreting [it] broadly"].)  On the contrary, the legislative history repeatedly indicates that the Legislature was concerned with the expansion of the organic marketplace generally, and protecting retail

---

[19]  For example, it states:  "Existing law, a violation of which is a misdemeanor, provides that no food shall be sold as organic unless it meets certain criteria, as specified, and accurate and specific records are kept detailing its production, handling, and sale. [¶] This bill would broaden the application of these provisions *to all organic products whether 100% organic or made with organic ingredients,* including food, pet food, nonfood plants, and cosmetics and provide that no product may be sold as organic unless it is produced in accordance with the regulations of the [NOP].  The bill would set forth other requirements relating to products containing organically produced ingredients and multi-ingredient cosmetic products sold as organic."  (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.), Summary Dig. pp. 208-209, italics added.)

[20]  For example, it states:  "Existing law specifies substances that are prohibited from being used in organic products. [¶] This bill would provide that prohibited products are any material prohibited under the federal Organic Foods Production Act of 1990.  This bill would permit the Secretary of the Department of Food and Agriculture to adopt regulations allowing or prohibiting the use of substances *in the processing of products that are exempt under the National Organic Program, cosmetics, and animal food sold as organic.*"  (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Summary Dig., p. 209, italics added.)

It also states:  "This bill would expand this requirement to cover persons engaged in processing or handling dietary supplements, alcoholic beverages, animal food, and cosmetics sold as organic."  (Legis. Counsel's Dig., Assem. Bill No. 2823 (2001-2002 Reg. Sess.) Summary Dig., p. 209.)

consumers generally regarding claims of organic content.[21]  Thus, on balance the legislative history tends to support construing COFFA broadly, applicable to all personal care products.

Finally, we also note that the legislative history sheds light on the two primary source of ambiguity in the statute's scope that Rael has posited.

First, it confirms that the stray reference to the term "food" in subdivision (b) of section 110830 we have discussed does indeed appear to be an inadvertent oversight.  Prior to COPA's passage, former section 110830, subdivision (f) stated, "No *food* may be advertised or labeled as 'organic when available' or similar terminology that leaves in doubt whether the *food* is being sold as organic."  (See West's Ann. Health & Saf. Code (2002 ed.), former § 110830, italics added.)  The legislation amended this by changing only the sentence's initial reference to "food" to "product," leaving the second reference to "food" intact, which is grammatically non-sensical.  (See Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as introduced Feb. 25, 2002, § 48

---

[21]  For example, as described by the Senate Floor analysis already discussed:  "The term 'organic', and its many variations seen on products, has become a viable marketing term for producers, processors, and marketers.  The organic floor space of various retail outlets has been increasing due to consumer demand for these products.  Given the rise in consumer demand for these products, it is important to ensure that labels, which claim that products are organic, are accurate."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended Aug. 12, 2002, p. 4.))  It also notes that "Proponents of this bill state that the bill will provide consistent standards to ensure adequate consumer protection and appropriate use of the term 'organic' when labeling and marketing commercially available products."  (*Id*., p. 5)  Similar statements appear throughout the various legislative reports we have discussed.  (See, e.g., Sen. Com. on Health and Human Services, Analysis of Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as amended June 11, 2002, pp. 5-6.)

41

[renumbering subdivision (f) to (b) and amending it to state "No ~~food~~ *product* may be advertised or labeled as 'organic when available' or similar terminology that leaves in doubt whether the food is being sold as organic"].) The Legislature obviously intended the word "product" to have a different meaning than "food," or this amendment would be meaningless.

Second, the structural anomaly in the law's registration requirements we have discussed pre-dates COPA's enactment in 2002. That is, under former law, as now, only *some* participants in the organic marketplace were required to register under section 110875: former section 110875 applied to anyone engaged in processing or handling "food sold as organic, including . . . fish or seafood" but exempted "processed meat, fowl, or dairy products" (see West's Ann. Health & Saf. Code (2002 ed.), former § 110875). Yet, then as now, it was unlawful under former section 110900 for "*any* person to produce, handle, or process food sold as organic unless duly registered pursuant to Section 110875." (West's Ann. Health & Saf. Code (2002 ed.), former § 110900, subd. (a), italics added.) The 2002 legislation substantially broadened the registration requirements of section 110875[22] but merely changed the word "food" in former section 110900 to "products." (See Stats. 2002, ch. 533, §§ 58, 63; see also Assem. Bill No. 2823 (2001-2002 Reg. Sess.) as introduced Feb. 25, 2002, § 63 [amending section 110900 to state: "It is unlawful for any person to produce, handle, or process ~~food~~

_____

[22] As noted, they now apply to anyone who processes or handles "processed products for human consumption, including dietary supplements, alcoholic beverages, and fish or seafood sold as organic (except for processors and handlers of processed meat, fowl, or dairy products and retailers that are engaged in the processing or handling or products sold as organic)" and to those who process or handle "animal food and cosmetics sold as organic." (§ 110875, subd. (a).)

42

*products* sold as organic unless duly registered pursuant to Section 110875"
(italics added).)  Hence, the 2002 legislation simply carried over a structural
feature of prior law.  Thus, the existence of this structural anomaly in the
current statute does not shed light on how broadly the Legislature intended
COFFA to apply.  At best, it merely raises a potential question concerning the
meaning and scope of the law's registration requirements that we do not need
to resolve.

## B.  Public Policy

We also conclude that excluding any category of retail product from
COFFA's coverage would lead to absurd results the Legislature could not
reasonably have intended.  COFFA's coverage of "cosmetics" includes a broad
range of personal care products (see § 109900, quoted at footnote 5, *ante,*
pp. 15-16).  Even so, excluding other types of personal care products as well
as other kinds of retail products from COFFA's coverage would leave
manufacturers of a vast array of products—including many like those at
issue here that are applied to, worn on or otherwise potentially affect the
human body—free to make claims about organic content to the consuming
public while, at the same time, manufacturers of dog food, cat food, and even
guinea pig pellets cannot do so without complying with COFFA's
requirements and enduring significant regulatory oversight.  Bug spray, for
example.  Laundry detergent.  Clothing.  Body soap.  Tobacco products.  Even
personal lubricants and condoms.  We do not think the Legislature intended
to protect consumers of pet food with regard to organic content and
advertising to a greater degree than consumers of household cleaning
products, feminine hygiene products, or products relating to sexual health.

Nor do we think the Legislature intended to protect consumers of only
one category of personal care product—cosmetics—more so than consumers of

all other types of personal care products. We can think of no reason for such a distinction nor, as discussed, is there any indication for such a distinction in the legislative history.

Rael argues, nonetheless, that applying COFFA literally to "all products" would lead to absurd results. It argues that applying COFFA broadly would make it "impossible for many organic products to be made or sold in California" by their very nature, due to the weight of their inorganic components such as the feminine hygiene products at issue here. It contends that a manufacturer could never accurately inform the consumers of such products that the product contains any certified organic ingredients. Nowhere on the product's label or packing, it contends, could the manufacturer inform consumers of the product's organic components if they comprise less than 95 percent of the product's total weight. It gives the example of a raincoat made with an organic cotton lining but an inorganic waterproof shell and zipper that "would always make it impossible for the raincoat to meet the NOP's Agricultural Percentage Requirements" such that the manufacturer could never inform consumers that the cotton lining is 100 percent certified organic cotton even though such a statement would be entirely accurate.

Such concerns appear to be overstated. As EDP points out, and as we have explained, COFFA incorporates the standards of NOP labeling regulations, which allow producers to identify organic ingredients even when the product itself contains less than the required minimums to market the product itself as "organic" or as "made with organic" ingredients. (See 7 C.F.R. §§ 205.301(d), 205.305.) They may do so accurately on the product's ingredient statement. What they cannot do is advertise the product itself as organic or as containing organic ingredients. To be clear, we do not decide

44

here what an "ingredient statement" means for products not subject to the NOP regulations (see 7 C.F.R. § 205.2 [definition of "ingredient statement"]) or how such a rule is intended to be applied in every context. Nor do we decide whether state regulators are free to modify those standards for products not governed by the NOP if interested parties, consumer groups or members of industry choose to lobby for such relief. Given the absence of any such regulations at present, it is enough to say that COFFA does not appear to preclude manufacturers from making such representations, as long as they do so accurately in accordance with the standards set forth in NOP regulations. In short, construing COFFA broadly would not in any way appear to prevent consumers from receiving accurate information about a product's composition. It would, in fact, ensure the opposite.

Moreover, even if Rael's construction of COFFA's labeling requirements were correct, at bottom the concerns it raises are for the Legislature to address not the courts. " 'To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them.' [Citation.] 'Moreover, our courts have wisely cautioned that the absurdity exception to the plain meaning rule "should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government. [Citation.] We do not sit as a 'super-legislature.' " ' " (*Davis Boat Manufacturing-Nordic, Inc. v. Smith, supra,* 95 Cal.App.5th 660, 673-674.) There is nothing extreme about permitting only those products that contain a specified percentage of certified organic material to be marketed as "organic" or as "made with organic" ingredients. Indeed, that is the very purpose of COFFA. Broadly applying COFFA to all products, the manufacturers of hand soap, bathroom cleaner or t-shirts can no more market their products as organic if they

45

contain only minimal amounts of certified organic material than the manufacturers of eyeliner or orange juice. That is not an absurd result.

## CONCLUSION

We conclude the trial court erred in ruling that Rael's feminine hygiene products are not "products" governed by COFFA. Accordingly, the trial court erred by granting judgment on the pleadings.

Having so concluded, we nonetheless acknowledge that some aspects of COFFA raise puzzling questions that we are not called upon here to definitively resolve. For example, the stray reference to the term "food" in subdivision (b) of section 110830 we have discussed appears to be an inadvertent oversight. Similarly, the intended scope and meaning of subsections (b) through (d) of section 110838 (specifying how to calculate the percentage of organic material in an "agricultural product") is not entirely clear and would benefit from legislative clarification. Likewise, we have no ready answer concerning the intended scope of COFFA's registration scheme (see §§ 110875, 110900). It is unclear if the Legislature intended to leave a gap in the registration requirements of section 110875, whether the answer lies in another portion of COFFA not brought to our attention or examined here, or instead whether there is an inadvertent gap in section 110875's registration requirements. Construction of COFFA's intended scope cannot and does not turn on the scope and meaning of COFFA's registration requirements, however, when all the other interpretive guides, including the statute's plain language and its purpose, point decidedly in favor of construing it broadly to all personal care products, including feminine hygiene products. Although we are required to harmonize disparate statutory provisions as best we can, "a canon of [statutory] construction cannot supersede the Legislature's clear intent." (*People ex rel. Garcia-*

46

*Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 731; accord, *Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1067.)  As other courts before us have done when confronted with comparably thorny issues, we respectfully invite the Legislature to amend the provisions we have discussed to clarify its intent regarding COFFA's scope if our interpretation leads to results it did not contemplate.  (See, e.g., *People v. Magill* (1986) 41 Cal.3d 777, 781, fn. 4; *Carr v. City of Newport Beach* (2023) 94 Cal.App.5th 1199, 1205, fn. 2; *Haytasingh v. City of San Diego* (2021) 66 Cal.App.5th 429, 463-464; *Holmes v. Jones* (2000) 83 Cal.App.4th 882, 891.)

## DISPOSITION

The judgment is reversed.  Appellant shall recover its costs.

STEWART, P.J.


We concur.

RICHMAN, J.

MILLER, J.


*Environmental Democracy Project v. Rael, Inc.* (A170385)

Trial Court:  Alameda County Superior Court

Trial Judge:       Hon. Stephen D. Klaus

Counsel:

Lexington Law Group, Patrick Carey and Jacob Janzen for Plaintiff and Appellant.

Rutan & Tucker, Michael D. Adams and Talya Goldfinger for Defendant and Respondent.